IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

January 7, 2008

Charles R. Fulbruge III
Clerk

No. 06-40713

GULF PETRO TRADING COMPANY INC;
PETREC INTERNATIONAL INC;
JAMES S FAULK; JAMES W FAULK

Plaintiffs - Appellants

v.

NIGERIAN NATIONAL PETROLEUM CORPORATION;
BOLA AJIBOLA; JACKSON GAIUS-OBASEKI, Individually;
SENA ANTHONY, Individually; ANDREW
W A BERKELEY; IAN MEAKIN; HANS VAN HOUTTE;
ROBERT CLARKE

Defendants - Appellees

Appeal from the United States District Court
for the Eastern District of Texas

Before KING, GARZA, and BENAVIDES, Circuit Judges.

KING, Circuit Judge:

This appeal is the latest round in a long-running dispute, previously submitted to arbitration in Switzerland, arising out of a contract to salvage "slop oil" generated by the operations of Nigeria's state-owned oil company. Plaintiffs–appellants—a Texas oil company, its subsidiary, and its principals—appeal the district court's dismissal of their complaint against the Nigerian company and various associated individuals. The district court

concluded that it lacked subject matter jurisdiction over the lawsuit, which it determined to be a collateral attack on a foreign arbitral award. It alternately concluded that suit against certain of the parties was barred on foreign sovereign immunity and personal jurisdiction grounds. For the reasons set out below, we conclude that this lawsuit was properly dismissed for lack of subject matter jurisdiction, as we agree that it represents a collateral attack on a foreign arbitral award. We therefore do not consider the district court's alternate holdings. AFFIRMED.

## I. BACKGROUND

The origins of this dispute lie in a 1993 joint venture agreement between Petrec International, Inc. ("Petrec"), and Nigerian National Petroleum Corporation ("NNPC"), whereby Petrec was to undertake reclamation and salvaging of slop oil discarded by NNPC in the course of its daily operations in Nigeria. Petrec is a wholly owned subsidiary of Gulf Petro Trading Company, Inc. ("GPTC"), a Texas oil field services company. NNPC is owned by the government of Nigeria. The agreement called for the creation of a Nigerian company, Petrec (Nigeria) Limited ("PNL"), which was to be jointly capitalized and owned by Petrec and NNPC. Petrec and NNPC agreed to submit any disputes arising out of the agreement to arbitration.

After NNPC allegedly failed to contribute its share of capital to PNL and refused to provide access to the areas needed to conduct the salvaging operations, Petrec initiated arbitration proceedings with the Chamber of Commerce and Industry of Geneva in 1998. The arbitration proceedings were phased, such that the panel would first consider issues of jurisdiction and liability before, if necessary, determining damages. After some delay and two evidentiary hearings, the panel issued a "Partial Award" on July 5, 2000, finding that Petrec had standing to pursue its claims and that NNPC had failed to contribute its share of capital to PNL. However, the panel further found that the

joint venture agreement did not confer exclusive rights to all of NNPC's slop oil on PNL, as Petrec had argued. Rather, NNPC's obligation was only to make available enough slop oil to keep PNL's operations viable and profitable.

In January 2001, the panel held a hearing for the purpose of determining the quantum of Petrec's damages. At this hearing, NNPC challenged the panel's jurisdiction and Petrec's standing by producing a copy of a Texas certificate of incorporation showing that an entity identified as "Petrec International Inc." had been incorporated in Texas on February 28, 2000, well after execution of the joint venture agreement and the demand for arbitration. On October 9, 2001, the panel issued a "Final Award," holding that Petrec lacked capacity to maintain its claims against NNPC. Additionally, the panel stated in dictum that had Petrec been able to sustain its claims, its damages would have been much lower than demanded in light of a variety of factors, including the panel's earlier determination in the Partial Award that the joint venture agreement did not confer exclusive rights to all of NNPC's slop oil on PNL.

Petrec challenged the Final Award in the federal court of Switzerland on grounds that it violated Swiss arbitration law and public policy, but the Swiss court upheld the panel's decision in April 2002. Petrec next filed a lawsuit in the Northern District of Texas, seeking, inter alia, confirmation of the Partial Award, in which the panel had found in Petrec's favor on some aspects of the question of NNPC's liability, and a determination of damages. The district court dismissed the action for lack of subject matter jurisdiction. See Gulf Petro Trading Co. v. Nigerian Nat'l Petrol. Corp., 288 F. Supp. 2d 783 (N.D. Tex. 2003). The court reasoned that in seeking confirmation of the Partial Award, Petrec was effectively requesting that the Final Award be set aside or modified, actions that the court was precluded from taking by the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York

Convention," or "Convention").[1] Id. at 792–93. The court also determined that doctrines of res judicata and international comity precluded it from revisiting the Swiss court's decision not to vacate the Final Award. Id. at 794–95. This court affirmed the decision of the district court in an unpublished opinion.

In September 2005, GPTC, Petrec, and principals James S. Faulk and James W. Faulk (collectively, "Gulf Petro") brought this action in the Eastern District of Texas, alleging that the Final Award was procured by fraud, bribery, and corruption. Gulf Petro has what is purportedly a March 18, 2002, letter from Chief Sena Anthony, NNPC's general counsel, to Andrew Berkeley, one of the arbitrators, detailing the payment of a $25 million bribe. According to the letter, this payment was authorized by various individuals within NNPC and was to be shared by the three arbitrators in return for delivery of a favorable award to NNPC in the slop oil arbitration. Gulf Petro also alleges that Berkeley and Ian Meakin, another arbitrator, engaged in a variety of undisclosed dealings and ex parte communications with NNPC that cast doubt on their impartiality as arbitrators in the matter.

Gulf Petro named as defendants NNPC, Anthony, Prince Bola Ajibola, formerly Nigeria's High Commissioner to the United Kingdom, Jackson Gaius-Obaseki, formerly NNPC's Group Managing Director, Robert Clarke, outside counsel to NNPC, and the three arbitrators, Berkeley, Meakin, and Hans van Houtte. In six separate counts, Gulf Petro sought relief under: (1) the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq. (three counts); (2) the Texas Deceptive Trade Practices Act ("DTPA"), TEX. BUS. & COMM. CODE § 17.46 et seq.; (3) Texas common law fraud; and (4) the Texas common law tort of civil conspiracy. In a seventh count, Gulf Petro sought to

---

[1] See 21 U.S.T. 2517 (entered into force with respect to the United States, December 29, 1970), implemented at 9 U.S.C. § 201 et seq.

nullify (i.e., vacate) the Final Award under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 et seq.

NNPC, Anthony, Ajibola, Obaseki, and Clarke filed a motion to dismiss, asserting lack of subject matter jurisdiction on account of the New York Convention and foreign sovereign immunity, as well as lack of personal jurisdiction.[2] The district court granted the motion in a March 15, 2006, order. The court first concluded that under the Convention it lacked subject matter jurisdiction to modify or vacate the Final Award. It then reasoned that although only one of Gulf Petro's claims explicitly sought to vacate the award, its remaining claims were based on the theory that bribery of the arbitrators rendered the Final Award invalid, and sought damages that Gulf Petro would only be entitled to if the Final Award were vacated. Therefore, the court concluded that Gulf Petro's entire complaint constituted a collateral attack on the Final Award that it lacked subject matter jurisdiction to entertain. Additionally, the court determined that NNPC, Anthony, and Obaseki were entitled to foreign sovereign immunity, and that it lacked personal jurisdiction over Ajibola and Clarke. Gulf Petro now appeals.

## II. STANDARD OF REVIEW

We review a dismissal for lack of subject matter jurisdiction de novo, using the same standard as the district court. Robinson v. TCI/US W. Commc'ns. Inc., 117 F.3d 900, 904 (5th Cir. 1997).

## III. DISCUSSION

Gulf Petro concedes on appeal that its claim seeking vacatur of the Final Award was properly dismissed for lack of subject matter jurisdiction, and we agree that the New York Convention requires this result. Gulf Petro first contests the district court's determination that the Convention requires

---

[2] The arbitrators did not join in the motion to dismiss and apparently never appeared in the lawsuit.

5

dismissal of the remaining claims in its complaint for lack of subject matter jurisdiction. For the reasons that follow, we conclude that those claims were properly dismissed as well.

As an initial matter, some discussion of the rules and framework established by the New York Convention is necessary to understand its application in this case. The Convention provides that it "shall apply to the recognition and enforcement of arbitral awards made in the territory of a [country] other than the [country] where the recognition and enforcement of such awards are sought." Convention, art. I(1). The award at issue in this case, which was made in Switzerland under arbitral proceedings governed by Swiss law, is clearly a foreign award within the scope of the Convention.

Though its "essential purpose" relates to the recognition and enforcement of foreign arbitral awards, "the underlying theme of the New York Convention as a whole is clearly the autonomy of international arbitration." FOUCHARD, GAILLARD, GOLDMAN ON INTERNATIONAL COMMERCIAL ARBITRATION § 250 (Emmanuel Gaillard & John Savage, eds., 1999) [hereinafter FOUCHARD]. To this end, the Convention "mandates very different regimes for the review of arbitral awards (1) in the countries in which, or under the law of which, the award was made, and (2) in other countries where recognition and enforcement are sought." Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara, 335 F.3d 357, 364 (5th Cir. 2003) (quoting Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc., 126 F.3d 15, 23 (2d Cir. 1997)) (internal quotation marks and brackets omitted). We have characterized the country "in which, or under the [arbitration] law of which," an award was made as having primary jurisdiction over the award. Id. All other signatory countries are then said to be secondary jurisdictions. Id. It is undisputed that Switzerland is the country of primary jurisdiction with respect to the Final Award.

6

"[T]he Convention does not restrict the grounds on which primary-jurisdiction courts may annul an award, thereby leaving to a primary jurisdiction's local law the decision whether to set aside an award." Id. at 368. Such courts are "free to set aside or modify an award in accordance with [the country's] domestic arbitral law and its full panoply of express and implied grounds for relief." Alghanim, 126 F.3d at 23.

In contrast, the Convention significantly limits the review of arbitral awards in courts of a secondary jurisdiction; essentially, "parties can only contest whether that [country] should enforce the arbitral award." Karaha Bodas, 335 F.3d at 364. "Articles IV and V of the Convention specify the procedures for courts of secondary jurisdictions to follow when deciding whether to enforce a foreign arbitral award." Id. at 368. "Article IV provides that a party can obtain enforcement of its award by furnishing to the putative enforcement court the authenticated award and the original arbitration agreement (or a certified copy of both)." Id. In turn, Article V enumerates the exclusive grounds on which a court of secondary jurisdiction may refuse recognition and enforcement of an award. See id.; M & C Corp. v. Erwin Behr GmbH & Co., 87 F.3d 844, 848–49 (6th Cir. 1996). Finally, Article VI allows a court of secondary jurisdiction to stay enforcement proceedings if an application to set aside the award is pending in the primary jurisdiction.

In sum, although the Convention permits a primary jurisdiction court to apply its full range of domestic law to set aside or modify an arbitral award, secondary jurisdiction courts may only refuse or stay enforcement of an award on the limited grounds specified in Articles V and VI. See Karaha Bodas, 335 F.3d at 368. As one commentator has explained, Articles V and VI of the Convention "unequivocally lay down the principle that the court in the country in which, or under the law of which, the award was made has the exclusive competence to decide on the action for setting aside the award." ALBERT JAN VAN

DEN BERG, THE NEW YORK ARBITRATION CONVENTION OF 1958: TOWARDS A UNIFORM JUDICIAL INTERPRETATION 350 (1981) (emphasis removed). Accordingly, a United States court sitting in secondary jurisdiction lacks subject matter jurisdiction over claims seeking to vacate, set aside, or modify a foreign arbitral award. See M & C, 87 F.3d at 849; Gulf Petro, 288 F. Supp. 2d at 792–93; Int'l Standard Elec. Corp. v. Bridas Sociedad Anonima Petrolera, Industrial y Comercial, 745 F. Supp. 172, 177, 182 (S.D.N.Y. 1990).

As noted above, though, Gulf Petro does not take issue with the district court's determination that it lacked subject matter jurisdiction over the claim seeking vacatur of the Final Award. Rather, Gulf Petro argues that the court erred in "extending" that holding to its remaining RICO, DTPA, and common law fraud and civil conspiracy claims. Gulf Petro challenges the dismissal of these claims on two fronts. First, it argues that the claims are not a collateral attack on the Final Award. Second, it contends that there is no basis for imposing a subject matter jurisdictional bar. We consider each argument in turn.

A.     Collateral Attack on the Final Award

Gulf Petro argues that a fair reading of its complaint shows that the RICO and state law claims are not disguised attempts to vacate or attack the Final Award. Rather, it contends that it has alleged a pattern of racketeering and conspiratorial conduct that, while arising in the context of arbitration proceedings, constitutes an independent violation of federal and state law and compels relief analytically distinct from vacatur. We disagree. Like the district court, we conclude that the claims asserted by Gulf Petro are no more, in substance, than a collateral attack on the Final Award itself.

The district court relied on Corey v. New York Stock Exchange, 691 F.2d 1205 (6th Cir. 1982), in determining that Gulf Petro's claims were an impermissible attack on the Final Award. In Corey, the plaintiff had initiated

arbitration proceedings against Merrill Lynch after his investment portfolio suffered significant losses. Id. at 1207. The rules of the New York Stock Exchange ("NYSE") governed the selection of the arbitration panel as well as the procedural rules to be followed, and an NYSE official was responsible for the preliminary arrangements of the arbitration and appointment of the panel. Id. at 1208. The arbitration panel ultimately dismissed the plaintiff's claim. Id.

The arbitration at issue in Corey fell under Chapter One of the FAA, which provides for limited judicial review of an arbitral award in the federal district court of the district in which the award was made. See id. at 1212 (discussing the FAA). However, instead of seeking relief under the FAA, the plaintiff brought suit against the NYSE, alleging that he was deprived of a fair hearing because the NYSE official had selected the panel in violation of NYSE rules and had adjourned and rescheduled hearings over the plaintiff's objection. Id. at 1207. These allegations of wrongdoing fell squarely within the scope of § 10 of the FAA, which provides for vacatur of an award in cases of evident partiality of the arbitrators or adjournments resulting in prejudice. See id. at 1212. After concluding that "the [FAA] provides the exclusive remedy for challenging acts that taint an arbitration award," the Sixth Circuit determined that the plaintiff's "attempt to sue the NYSE . . . [was] no more, in substance, than an impermissible collateral attack on the award itself." Id. at 1211–12. The court explained its reasoning as follows:

> [The plaintiff's] claims constitute a collateral attack against the award even though [the plaintiff] is . . . requesting damages for the acts of wrongdoing rather than the vacation, modification or correction of the arbitration award. [The plaintiff] was not harmed by the selection of the arbitrators and the adjournments of the hearings in and of themselves . . . . Rather, he was harmed by the impact these acts had on the award. [The plaintiff's] complaint has

9

no purpose other than to challenge the very wrongs affecting the award for which review is provided under section 10 of the [FAA].

Id. at 1213.

NNPC also directs our attention to a similar case, Decker v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 205 F.3d 906 (6th Cir. 2000), in which the Sixth Circuit affirmed the dismissal of several contract and tort claims alleging wrongdoing in the course of an arbitration proceeding. The plaintiff in Decker was engaged in arbitration with Merrill Lynch when the chairperson of the arbitration panel revealed that his law firm had been hired by a Merrill Lynch subsidiary in connection with several real estate transactions. Id. at 908. The panel denied the plaintiff's motion to recuse the chairperson, proceeded with the arbitration, and issued an award. Id. Instead of seeking to vacate the award under the FAA, the plaintiff brought various claims against Merrill Lynch based on its hiring of the chairperson's law firm. Id.

As in Corey, the court looked to the alleged harm suffered by the plaintiff, which "did not result when the Merrill Lynch subsidiary hired the chairperson . . . , but instead resulted from the impact of this action on the arbitration award." Id. at 910. The "ultimate objective in this damages suit," the court continued, was "to rectify the alleged harm [the plaintiff] suffered by receiving a smaller arbitration award than she would have received in the absence of the chairperson's relationship with Merrill Lynch." Id. Because this objective should have been pursued by filing a motion to vacate under the FAA, the court concluded that the plaintiff's suit was a collateral attack requiring dismissal. Id. at 910–11.

Although Corey and Decker involved allegations of wrongdoing in the context of domestic arbitrations, rather than international arbitrations, we find the reasoning employed in both cases on the question of when a claim constitutes a collateral attack on an arbitral award to be persuasive. In both cases,

10

plaintiffs alleged wrongdoing in the course of an arbitration but did not explicitly seek to overturn or modify the award. In response, the Sixth Circuit examined the relationship between the alleged wrongdoing, purported harm, and arbitration award, and concluded that because the harm was not caused by the wrongdoing in and of itself, but rather by the impact of the acts complained of on the award, the claims were no more than collateral attacks on the award. With this methodology in mind, we turn to Gulf Petro's complaint.[3]

Gulf Petro alleges two broad categories of wrongdoing on the part of NNPC, its officials and attorneys, and the arbitrators. First, it alleges that NNPC paid a $25 million bribe to the arbitrators in order to procure a favorable outcome in the slop oil arbitration. Second, it alleges that two of the arbitrators had a variety of business dealings and ex parte communications with NNPC and its attorneys that they failed to disclose prior to or during the arbitration. According to Gulf Petro, arbitrator Berkeley failed to disclose that he traveled to Nigeria shortly before the arbitration to discuss the matter with NNPC, had previously served on an arbitration panel with members of the Nigerian government, engaged in internet and phone communications with NNPC

---

[3] We decline Gulf Petro's invitation to apply the reasoning found in Mian v. Donaldson, Lufkin & Jenrette Securities Corp., 7 F.3d 1085 (2d Cir. 1993) (per curiam), which Gulf Petro contends limits the holding of Corey. In Mian, the plaintiff brought a pro se action under 42 U.S.C. §§ 1981, 1985, and 1986, alleging that the "defendants impermissibly discriminated against him because of his race during the course of an arbitration." Id. at 1086. Although the court acknowledged that the issue was not "free of all doubt," it concluded that the plaintiff's failure to seek vacatur of the award under the FAA did "not prevent him from seeking to recover damages for alleged civil rights violations that occurred during the arbitration proceeding itself," even if "a major component of the damages sought would consist of the amount of the arbitration award." Id. at 1086–87. In so holding, the Mian court was apparently influenced by language in a then-recent Supreme Court opinion stating that § 1981 "'covers wholly private efforts to . . . obstruct nonjudicial methods of adjudicating disputes.'" Id. at 1087 (quoting Patterson v. McLean Credit Union, 491 U.S. 164, 177 (1989)) (emphasis in original). As we discern no similar considerations in the instant case, we believe that Corey and Decker supply the proper analytical framework for determining if Gulf Petro's claims constitute a collateral attack on the Final Award. See also Foster v. Turley, 808 F.2d 38, 41–42 (10th Cir. 1986).

officials and attorneys, accepted appointments from NNPC to serve on other arbitration panels, and had ongoing relationships with law firms that represented NNPC. Arbitrator Meakin allegedly failed to disclose that he had been associated with a Swiss law firm that represented NNPC.

Based on these allegations, Gulf Petro asserts violations of RICO, the Texas DTPA, and Texas common law fraud and civil conspiracy. For each claim, Gulf Petro seeks the following damages: (1) costs and expenses of the arbitration and subsequent legal challenges; (2) lost expenses and profits that would have been awarded had the panel rendered a fair award; (3) reputational injury suffered as a consequence of not prevailing in the arbitration; and (4) lost business opportunities suffered as a consequence of not prevailing in the arbitration.

Gulf Petro briefly contends that its claims cannot be construed as a collateral attack on the Final Award because they do not attempt to relitigate the facts and defenses that were raised in the prior arbitration. In one sense, however, they do seek to relitigate certain issues, since Gulf Petro asks for as damages the award it believes it should have received in the arbitration, which would require an inquiry into questions of liability that were already presented to the arbitration panel. We do recognize that the specific allegations of bribery and corruption are separate from the contract dispute over slop oil that was the subject of the arbitration. However, it does not follow that these claims cannot be construed as a collateral attack. Limiting the concept of a collateral attack as Gulf Petro suggests would be squarely at odds with Corey and Decker, where the plaintiffs were found to be engaged in collateral attacks even though they did not attempt to relitigate the facts and defenses of the underlying disputes that had prompted arbitration, but instead were alleging that wrongdoing had tainted the arbitration proceedings and caused unfair awards.

More broadly, Gulf Petro argues that the claims it advances and relief it seeks are analytically distinct from vacatur. However, this argument is belied by a close examination of the allegations and damages actually found in Gulf Petro's complaint. Gulf Petro contends that it has pled independent violations of federal and state law, but the ultimate significance of the conduct it complains of can only be found in the effect that it had on the Final Award. Like the plaintiffs in Corey and Decker, Gulf Petro's harm was not caused by the alleged acts of wrongdoing in and of themselves. The harm in this case did not result when the arbitrators failed to disclose business dealings, engaged in ex parte communications with NNPC, or were bribed. Rather, it resulted from the impact that these acts had on the Final Award. The relief Gulf Petro seeks—the award it believes it should have received, as well as costs, expenses, and consequential damages stemming from the unfavorable award it did receive—shows that its true objective in this suit is to rectify the harm it suffered in receiving the unfavorable Final Award. Under the framework of the New York Convention, the proper method of obtaining this relief is by moving to set aside or modify the award in a court of primary jurisdiction. Though cloaked in a variety of federal and state law claims, Gulf Petro's complaint amounts to no more than a collateral attack on the Final Award itself.

B.    Dismissal for Lack of Subject Matter Jurisdiction

Gulf Petro also argues that its federal and state law claims cannot properly be the subject of a Rule 12(b)(1) dismissal for lack of subject matter jurisdiction. See FED. R. CIV. P. 12(b)(1). We disagree. Because the Convention bars the litigation of claims of the type asserted by Gulf Petro in all but the courts of the primary jurisdiction, dismissal for lack of subject matter jurisdiction was appropriate in this case.

Gulf Petro first argues that there is no basis for the notion that a complaint can be dismissed on subject matter jurisdictional grounds as a

collateral attack on an arbitral award. It points out that in Corey and Decker, the complaints that were held to be collateral attacks were dismissed for failure to state a claim upon which relief can be granted or on summary judgment, and not for lack of subject matter jurisdiction. This argument misapprehends the significance of Corey and Decker to the instant case, which lies in the reasoning employed by the Sixth Circuit in concluding that the claims asserted were collateral attacks on arbitration awards, and not in the final dispositions of the cases themselves. Corey and Decker were litigated in the shadow of the framework for judicial review of domestic arbitrations established by Chapter One of the FAA, while the instant case is being litigated in the shadow of the framework for international arbitrations established by the New York Convention, which is implemented by Chapter Two of the FAA. Once it has been established that Gulf Petro's claims constitute a collateral attack on a foreign arbitral award, it is the Convention, and not Corey or Decker, that dictates the appropriate disposition.[4]

Gulf Petro also characterizes the dismissal in this case as creating an "arbitration exception" to federal subject matter jurisdiction, and warns of ominous consequences that it expects will follow if the district court's decision is upheld. For example, Gulf Petro states that this so-called exception will render unenforceable statutes that make it a crime to obstruct justice or suborn the corruption of an arbitration panel, preclude application of RICO's civil provisions to "irregularities arising from conduct relating to arbitration," and, more generally, bar lawsuits that touch even tangentially upon arbitration. We

---

[4] On a related note, Gulf Petro asserts that no provision of the FAA can be construed to bar federal subject matter jurisdiction over its claims. Further, Gulf Petro argues that since Chapter One of the FAA does not even grant an independent ground for federal subject matter jurisdiction, it cannot strip jurisdiction over otherwise cognizable claims. But the absence of a jurisdiction-granting provision in Chapter One of the FAA is of no import here, as Chapter Two provides that the Convention "shall be enforced" in United States courts, and it is the Convention, not Chapter One, that controls in this case. See 9 U.S.C. § 201.

believe these fears of a wide-ranging "arbitration exception" to be unfounded, as our holding in this case is actually quite narrow, and only bars jurisdiction over claims that, when evaluated under the analytical framework of Corey and Decker, are determined to be a collateral attack on a foreign arbitral award. For one, we fail to see how this methodology could be employed to preclude statutes criminalizing activities that might occur in an arbitration. Nothing in Corey and Decker can be taken as affecting the availability of criminal prosecutions under such statutes, as those cases simply stand for the proposition that "where a party files a complaint . . . seeking damages for an alleged wrongdoing that compromised an arbitration award and caused the party injury, it 'is no more, in substance, than an impermissible collateral attack on the award itself.'" Decker, 205 F.3d at 910 (quoting Corey, 691 F.2d at 1211–12). Nor do we believe that the result here will preclude lawsuits that touch only tangentially on an arbitration, since a plaintiff need only be able to allege wrongdoing that has caused harm independent of its effect on the arbitration award to avoid the collateral attack label.[5]

We also have considered the possibility that the Final Award's effect on Gulf Petro's claims should have been evaluated under the doctrine of res judicata, rather than as a jurisdictional inquiry. Under this line of thinking, Gulf Petro's RICO and state law claims would have survived NNPC's 12(b)(1) motion, but individual elements of those claims could later have been challenged on res judicata grounds through an affirmative defense. In fact, the Convention acknowledges that foreign awards can serve as res judicata in secondary

---

[5] To take Gulf Petro's example of a hypothetical RICO lawsuit relating to "irregularities arising from conduct relating to arbitration," it seems likely that if the link between the conduct complained of and the arbitration was indeed so attenuated that the wrongdoing could truly be characterized as only "arising from conduct relating to arbitration," then at least some of the resulting claims would be based on harm independent of the arbitration award and therefore could not be construed as a collateral attack. Such a suit, however, is not before this court.

jurisdictions, and accordingly provides for the "recognition" of an award, in addition to the more commonly invoked enforcement.[6] See Convention, arts. III–V. Recognition typically occurs "in a court action between the same parties on the same subject matter as decided in the foreign award." VAN DEN BERG, supra, at 244. In such a case, "the defendant requests the recognition of the award by invoking its effect of res judicata . . . ." Id. It might therefore be suggested that instead of granting NNPC's 12(b)(1) motion and dismissing Gulf Petro's claims for lack of subject matter jurisdiction, the district court should have entertained a motion to recognize the Final Award, in which case Gulf Petro could have asserted the specific defenses to recognition found in Article V.[7] However, the nature of Gulf Petro's claims, which relate first and foremost to the alleged tainting of the arbitration proceedings rather than the underlying contract dispute itself, counsels against such a course of action. There is simply more at work here than res judicata, as Gulf Petro's claim that NNPC suborned the corruption of the panel, though certainly arising out of the arbitration proceedings, is not a matter that was decided in those proceedings.

Finally, Gulf Petro argues that any limitations imposed on courts of secondary jurisdiction by the Convention should be overlooked in this case because relief is not available in the primary jurisdiction of Switzerland. We note that Gulf Petro already has sought to have the Final Award set aside in Switzerland, although on different grounds than it advances here. According to Gulf Petro, though, it has no means of vindicating its new claims of bribery and

---

[6] Most cases under the Convention involve requests for enforcement: typically, a party who has prevailed in a foreign arbitration seeks to collect on the award by confirming it in a country where the losing party has assets. See VAN DEN BERG, supra, at 243–44. Recognition, on the other hand, "may be requested where the party relying on an award merely wishes it to have a negative effect." FOUCHARD, supra, § 1667.

[7] The same conditions as for an enforcement of an award found in Articles IV–VI are applicable to a recognition. See VAN DEN BERG, supra, at 244.

corruption in Switzerland because it has been unable to initiate a criminal proceeding against the arbitrators in that country, such an action apparently being a prerequisite to obtaining reconsideration of the Swiss court's earlier decision. Some commentators suggest that the absence of any possibility of setting aside an award in the primary jurisdiction justifies removing the protection of the Convention from an award. See FOUCHARD, supra, § 1688 (discussing views on this issue). But this view is almost unanimously rejected. Id. § 1689. In any event, Gulf Petro has already had one opportunity to set aside the award in Switzerland, and now seeks a second opportunity. Needless to say, we have come across no suggestion that the absence of multiple opportunities to set aside an award in the primary jurisdiction should render the protections of the Convention inapplicable. In the interest of finality, every primary jurisdiction undoubtedly will foreclose review of an award at some point. It would seriously undermine the functioning of the Convention if the fact that the opportunity for judicial review of an award in the primary jurisdiction has passed could open the door to otherwise impermissible review in a secondary jurisdiction. Moreover, "it is not the district court's burden or ours to protect [a party] from all the . . . hardships it might undergo . . . as a result of this foreign arbitration or the international commercial dispute that spawned it." Karaha Bodas, 335 F.3d at 369. There is no basis for an exception here.

We have seen that the Convention operates by "assigning . . . different roles to national courts to carry out the aims of the treaty." Id. at 368. As discussed above, the role assigned to courts of secondary jurisdiction is a limited one. It is undisputed that the Convention precludes a court of secondary jurisdiction from vacating, setting aside, or modifying a foreign arbitral award. See M & C, 87 F.3d at 849. And given the particular interests at stake in arbitration, it is not surprising that this limitation has been implemented in the form of a jurisdictional bar, which provides an extremely effective method for

17

choking off post-arbitration litigation at the earliest possible moment, thereby encouraging finality and limiting costs.

At the outset of this appeal, all parties stood in agreement that Gulf Petro's claim seeking vacatur constituted a direct attack on the Final Award, and was therefore properly dismissed by the district court for lack of subject matter jurisdiction. We have since concluded that Gulf Petro's remaining claims, though ostensibly sounding in independent sources of law, are no more than an indirect attack on that same award. Having come this far, it would be perverse to say that the disposition that Gulf Petro itself concedes to be appropriate for the former claim—dismissal for lack of subject matter jurisdiction—is somehow inappropriate for the latter ones. Put simply, Gulf Petro's entire complaint is an attempt to set aside the Final Award and replace it with a modified award. The Convention dictates that a United States court, sitting in secondary jurisdiction, lacks jurisdiction to consider such an action. We do not see what result, other than dismissal for lack of subject matter jurisdiction, should follow.

## IV. CONCLUSION

Having concluded that Gulf Petro's claims were properly dismissed for lack of subject matter jurisdiction, we see no need to consider Gulf Petro's challenges to the district court's alternate rulings on the issues of foreign sovereign immunity and personal jurisdiction. The judgment of the district court is AFFIRMED.