United States Court of Appeals
Fifth Circuit

**F I L E D**

April 21, 2006

Charles R. Fulbruge III
Clerk

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 04-20842

_____

BRIDAS S.A.P.I.C., BRIDAS ENERGY INTERNATIONAL, LTD.,
INTERCONTINENTAL OIL AND GAS VENTURES, LTD., and BRIDAS CORP,

Plaintiffs-Appellants,

versus

GOVERNMENT OF TURKMENISTAN, CONCERN BALKANNEBITGAZSENAGAT and
STATE CONCERN TURKMENNEFT,

Defendants-Appellees.

---

Appeal from the United States District Court
for the Southern District of Texas, Houston Division

---

Before JONES, Chief Judge, and DeMOSS and OWEN, Circuit Judges.

EDITH H. JONES, Chief Judge:

Bridas S.A.P.I.C. ("Bridas") appeals the district court's vacatur of an arbitration award against the Government of Turkmenistan ("Government"), a nonsignatory to an arbitration agreement between Bridas and a government-owned oil and gas company. Because the totality of the record demonstrates that the Government should be bound as an alter ego of State Concern Turkmenneft ("Turkmenneft"), we REVERSE and RENDER for enforcement of the award.

This dispute has been in litigation longer than the agreement that spawned it. Bridas has pursued recovery against the Government for an oil and gas development deal gone awry. The catch has been that the Government was never a signatory to the relevant contractual documents. Bridas has borne the burden, before an arbitration panel and in federal court, of holding the Government liable. This appeal, after remand to the district court, represents the final refinement of numerous theories Bridas advanced against the Government. We review the district court's conclusion on remand that the Government was not an alter ego of Turkmenneft.

## I.  Background

In February 1993, Bridas, an Argentine corporation, entered into a joint venture agreement ("JVA") to exploit oil and gas resources with an entity designated by the Government of Turkmenistan, then recently liberated from the Soviet Union. Turkmenistan was rich in resources, but poor in technical expertise. Bridas was designated as the "foreign party" in the Joint Venture Keimir (named for the region in which exploration would be conducted). The "Turkmenian Party" to the agreement has been an entity wholly owned by the Government, whose identity was designated and re-designated at will by the President of Turkmenistan and has changed a number of times during the life of

the joint venture.[1]  Turkmenneft is the last entity to step into the role of "Turkmenian Party."  Under the JVA, the Turkmenian Party was entitled to receive hydrocarbon production up to the November 1992 levels, while the parties would split any subsequent increase in production.  The JVA secured an unlimited export license for hydrocarbons.[2]

Notwithstanding that the JVA was intended to last twenty-five years, the relationship among Bridas, the Turkmenian Party, and the Government soured quickly.  The Government insisted, among other things, on raising its share of future proceeds.  To force Bridas's submission, the Government ordered Bridas in November 1995 to halt operations in Keimir and cease making imports into and exports from Turkmenistan.

Six months later, Bridas commenced an arbitration proceeding, as provided in the JVA, against the Government and Turkmenneft under the auspices of the International Chamber of Commerce.  After Bridas filed its arbitration complaint, the Government dissolved the "Turkmenian Party" in the JVA, replacing

---

[1]     The original "Turkmenian Party" in the JVA was PA Turkmenneft.  The Government claims that PA Turkmenneft and its successors can trace their roots back to 1922, and the founding of the Turkmen Oil Department by the All-Russian Soviet on National Energy, and that the legal status and core functions of the "Turkmenian Parties" remained essentially unchanged during the life of the JVA.  Even assuming that the assorted "Turkmenian Parties" assumed the responsibilities and performed the functions of their predecessors, the constant restructuring of Turkmenian oil concerns belies the Government's contention that the "Turkmenian Parties" were somehow identical.

[2]     Curiously, Bridas has successfully maintained another joint venture arrangement in Turkmenistan concerning the hydrocarbon resources in a different province.

it with Turkmenneft.  The Government further abolished its Ministry of Oil and Gas.  More importantly, the Government decreed that all proceeds from oil and gas exports in the country were to be directed to a special State Oil and Gas Development Fund; the fund's assets were declared immune from seizure.[3]

The arbitration was held by agreement in Houston, Texas, and covered nineteen days of trial proceedings plus the introduction of voluminous documentary evidence.  A series of arbitration decisions was issued during the next several years by a two-to-one panel majority.  Pertinent here, the panel held that the Government was a proper party to the arbitration and that the tribunal had the authority to adjudicate Bridas's dispute with the Government.  The tribunal held both Turkmenneft and the Government liable for repudiating the JVA.  In early 2001, the tribunal issued its final award of $495 million in damages to Bridas.

The dispute then moved to federal court in Houston as the parties filed cross motions to confirm, modify, or reject the arbitration award.  The district court initially upheld the award, concluding that the Government was bound by the JVA under principles of agency and estoppel.  This court, in <u>Bridas S.A.P.I.C. v. Government of Turkmenistan</u> ("<u>Bridas I</u>"), 345 F.3d 347 (5th Cir. 2003), considered several theories that could bind a non-

---

[3]     Six months earlier, the Government had already begun attempting to limit its exposure to liability when it passed a law expressly defining itself as only the Council of Ministers.

4

signatory to an arbitration agreement: agency, alter ego, estoppel, and third-party beneficiary.[4]  Rejecting all but one of those theories, Bridas I remanded for further consideration of the alter ego doctrine, as it found the district court's analysis of this "highly fact-based" issue incomplete and insufficient.  The district court was instructed to "take into account all of the aspects of the relationship between the Government and Turkmenneft."  Id. at 359-60.  Because this court resolved other issues concerning the award in Bridas's favor, the sole issue on remand was reconsideration of the alter ego theory.

The district court on remand reviewed many of the factors identified by this court as pertinent and held that there was "an insufficient showing of complete domination or extensive control so as to warrant a finding that Turkmenneft was the alter ego of the Government of Turkmenistan."  Bridas has appealed from the district court's resulting decision to vacate the award against the Government.

## II.  Discussion

As was noted in Bridas I, federal courts are not bound by the arbitration panel's findings holding the Government liable to

---

[4]     The panel did not consider two other theories, incorporation by reference and assumption, which Bridas had waived on appeal.  Bridas I, 345 F.3d at 356.

Bridas.[5]  Bridas I, 345 F.3d at 355-56.  We review the district court's alter ego determination only for clear error.  Zahra Spiritual Trust v. United States, 910 F.2d 240, 242 (5th Cir. 1990).  Any errors of law are not entitled to such deference and are reviewed de novo.  W.H. Scott Construction Company v. City of Jackson, 199 F.3d 206, 219 (5th Cir. 1999).

A bedrock principle of corporate law is that "a parent corporation . . . is not liable" for actions taken by its subsidiaries.  United States v. Bestfoods, 524 U.S. 51, 61, 118 S. Ct. 1876, 1884 (1998).  The same concepts of corporate separateness have been applied to business entities owned by foreign governments.  First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba (Bancec), 462 U.S. 611, 623-27, 103 S. Ct. 2591, 2598-2600 (1983).  However, courts will apply the alter ego doctrine and hold a parent liable for the actions of its instrumentality in the name of equity when the corporate form is used as a "sham to perpetrate a fraud."  Pan Eastern Exploration Co. v. Hufo Oils, 855 F.2d 1106, 1132 (5th Cir. 1988).  In making

---

[5]     There is an air of unreality to the analysis in this opinion, first because the JVA specified both that English law would govern the parties' relationship, and the arbitral tribunal was to convene in Stockholm, Sweden.  The parties, however, agreed to arbitrate in Houston, Texas, and both parties have relied exclusively on U.S. law.  As these agreements do not have jurisdictional consequences, this court is bound to decide a wholly foreign dispute that has been fortuitously arbitrated in this country.

Second, while Bridas I noted the parties' agreement that "federal common law" governs this case, and we are bound by the earlier panel's approach under law of the case doctrine, this agreement rested on a fundamental misunderstanding.  It is highly unlikely that any uniform rule of federal law is or should be involved here.  See United States v. Jon-T Chemicals, Inc., 768 F.2d 686, 690 n.6 (5th Cir. 1985).

6

an alter ego determination, a court is "concerned with reality and not form, [and with] how the corporation operated." United States v. Jon-T Chemicals, Inc., 768 F.2d 686, 693 (5th Cir. 1985). Unlike the theory of agency, which interprets a contractual relationship, Bridas I, 345 F.3d at 358, alter ego examines the actual conduct of the parent vis-á-vis its subsidiary.

The alter ego doctrine, like all variations of piercing the corporate veil doctrine, is reserved for exceptional cases. In re Multiponics, Inc., 622 F.2d 709, 724-25 (5th Cir. 1980). The doctrine applies only if "(1) the owner exercised complete control over the corporation with respect to the transaction at issue and (2) such control was used to commit a fraud or wrong that injured the party seeking to pierce the veil." Bridas I, 345 F.3d at 359. Given the difficulty of analyzing the control factors in this case, we first address the "fraud or injustice" prong.

## A.  Fraud or Injustice

To prevail, Bridas had to demonstrate that the Government used its control over Turkmenneft to commit a "fraud or injustice" against Bridas. See Bancec, 462 U.S. at 630, 103 S. Ct. at 2601; Edwards Co. v. Monogram Indus., Inc., 730 F.2d 977, 984 (5th Cir. 1984). The Government asserts that only fraud – and no other type of injustice – satisfies this prong of the alter ego test. Edwards and other cases plainly envision a broader scope that includes the misuse of the corporate form to promote injustice. See Edwards,

7

730 F.2d at 981, 984. In both Jon-T and Subway Equip. Leasing Corp. v. Sims (In re Sims), 994 F.2d 210 (5th Cir. 1993), this court explained that "fraud" may be required to pierce the corporate veil in contract cases, because the party seeking to utilize the doctrine has had the opportunity, during negotiations with a subsidiary, to obtain assurances of payment from its parent. Even there, however, the decisions acknowledge that the test may be met through an "illegal act" or "[misuse of] the corporate form." Sims, 994 F.2d at 217-18. In this contract dispute, Bridas thus had to connect the Government misuse of its "subsidiary" Turkmenneft to the fraud or injustice against it.

In this case, the act of injustice on which the district court focused was the Government's 1995 export ban, which was accomplished through "the Government's exercise of sovereign control of Turkmenistan's borders, not through governmental control of Turkmenneft." The Government's exercise of its sovereign powers may have constituted a wrong to Bridas, but it was not a wrong based on misuse of the corporate organizational form. Contrary to the court's conclusion, the 1995 export ban is not a "fraud or injustice" for alter ego purposes.

This court may, however, affirm the district court's determination that the "fraud or injustice" prong was satisfied if there is other evidence on the record, and argued by Bridas below, to support such a holding. See Bickford v. Int'l Speedway Corp., 654 F.2d 1028, 1031 (5th Cir. 1981).

8

As it happens, there is ample evidence that after the 1995 export ban the Government misused Turkmenneft to harm Bridas by destroying the value of the JVA. In 1996, when the Government dissolved the Turkmenian Party and replaced it with Turkmenneft,[6] Turkmenneft was initially capitalized with the equivalent of only $17,000 U.S. and was funded by a State Oil and Gas Development Fund expressly rendered immune from seizure under newly enacted Turkmenian law. Yet Turkmenneft became the party bound to arbitrate under the JVA and liable for any adverse award. At the same time, the Government issued a number of decrees distancing itself from the joint venture and attempting to limit its potential exposure to liability. The Government's manipulation of Turkmenneft to prevent Bridas from recovering any substantial damage award satisfies the "fraud or injustice" prong. See Patin v. Thoroughbred Power Boats, Inc., 294 F.3d 640, 648-49 (5th Cir. 2002)(piercing the corporate veil where a company transferred its operations from one party to another to escape liability).

## B. Control

The more difficult issue is whether the Government exercised such complete control over Turkmenneft as to be its alter ego. Bridas I held that the district court erred in failing to

---

[6]     This should not imply that the act of changing parties was an indication of fraud or injustice per se, as such power was recognized in the Turkmenian President by the JVA, and was approved of by Bridas on other occasions. However, the Government's manipulation of the Turkmenian Party in this instance indicates that the Turkmenian Party was utilized to disadvantage Bridas in any contractual dispute.

consider "the totality of the circumstances in which the [corporation] functions." Bridas I, 345 F.3d at 359. The panel remanded to the district court with a long though non-exclusive list of factors to consider in its application of the alter ego doctrine. Id. at 360, n. 11.

Bridas I first identified twelve "private law" factors commonly utilized by this circuit in making a corporate alter ego determination:

> (1) the parent and subsidiary have common stock ownership; (2) the parent and subsidiary have common directors or officers; (3) the parent and subsidiary have common business departments; (4) the parent and subsidiary file consolidated financial statements; (5) the parent finances the subsidiary; (6) the parent caused the incorporation of the subsidiary; (7) the subsidiary operated with grossly inadequate capital; (8) the parent pays salaries and other expenses of subsidiary; (9) the subsidiary receives no business except that given by the parent; (10) the parent uses the subsidiary's property as its own; (11) the daily operations of the two corporations are not kept separate; (12) the subsidiary does not observe corporate formalities.

Id. The court then referenced three more private law factors: "(1) whether the directors of the 'subsidiary' act in the primary and independent interest of the 'parent'; (2) whether others pay or guarantee debts of the dominated corporation; and (3) whether the alleged dominator deals with the dominated corporation at arm's length." Id. Finally, the panel instructed the district court to take into account six "public law" factors held relevant in this court's cases, to determine whether a state agency shares the state's Eleventh Amendment sovereign immunity:

10

(1) whether state statutes and case law view the entity as an arm of the state; (2) the source of the entity's funding; (3) the entity's degree of local autonomy; (4) whether the entity is concerned primarily with local, as opposed to statewide, problems; (5) whether the entity has the authority to sue and be sued in its own name; and (6) whether the entity has the right to hold and use property.

Id. In all, the district court was given the task of evaluating how up to twenty-one factors bear on the facts of this case.[7]

The district court ultimately concluded that the Government did not "exercise complete domination or extensive control" over Turkmenneft. The district court conscientiously attempted to analyze the relationship between the Government and Turkmenneft according to our opinion in Bridas I and prior case law. We respectfully but firmly disagree with the district court's conclusion and find it clearly erroneous. The court's error lay in elevating the form over the substance of the relationship as it pertained to the transaction with Bridas. Compare Jon-T, 768 F.2d at 693 (stressing that in applying the alter ego doctrine, courts must be "concerned with reality and not form").

The court first examined the "formalities factors" in the Government-Turkmenneft relationship.[8] The court observed that the

---

[7] We note that in Jon-T, 768 F.2d at 691-92, this court provided a "laundry list" of factors that may be relevant in a corporate veil-piercing case, but we commented that it may not be necessary to analyze each of them in every case.

[8] The district court included in this part of the discussion: whether the parent and subsidiary have common stock ownership; common directors or officers; common business departments; parent cause incorporation of the subsidiary; subsidiary's authority to sue and be sued in its own name; subsidiary's observance of corporate formalities; subsidiary's right to hold and

11

Government caused the incorporation of Turkmenneft and that there was some identity between high-ranking Government and Turkmenneft officials. Further, Government officials attended the JVA's board meetings. More important to the court, however, were that Turkmenneft's "legal status was explicitly recognized on the face of the JVA"; that Turkmenneft is "solely responsible for its own obligations"; and Turkmenneft existed "as a juridical entity long before the events in question." The court also found that Turkmenneft and its predecessors had the right to and did actually hold and use property, and that Turkmenneft can sue and be sued in its own name.

The court did not consider "all of the formalities required by corporation law, including keeping separate books and records and holding regular meetings of shareholders and of the board of directors." Jon-T, 768 F.2d at 693. Nevertheless, based on the evidence that it considered, the court reached a plausible outcome that Turkmenneft exhibited certain "corporate formalities." Those aspects of the equitable calculation are, however, subordinate to ascertaining the reality of the corporate relationship. Jon-T, 768 F.2d at 693.

---

use property.

12

The court found, with regard to the "operations" factors, that Turkmenneft was "operationally separate from the Government."[9] The court relied heavily on the assertions that Turkmenneft could trace its origins back many decades within the structure of the then-Soviet Union, but see note 1, supra, and that it had engaged in joint ventures with other foreign concerns. The court recited the arbitrator's conclusion that under the JVA, "[Bridas] tended to run the project as their own fiefdom, which to some extent by the terms of the JV Agreement, it was." Further, in two instances, Turkmenneft officials had sided with Bridas against the Government. On these grounds, the court found Turkmenneft was operationally separate from the Government.

Immediately preceding that conclusion, however, and contradicting it, the court described Turkmenneft as a "closely held subsidiary, demonstrated by how the Government is continuously changing the name of the organization," and by how the Government used its sovereign powers to force Bridas to give Turkmenneft a financial advantage which would ultimately benefit the Government. The court also found that the Government "did not really deal with Turkmenneft at arm's length."

---

[9] The "operations" factors include whether: parent and subsidiary have common business departments; subsidiary receives no business except that given by the parent; parent uses the subsidiary's property as its own; separateness of the two corporations' daily operations; whether directors of the "subsidiary" act independent and primary interest of the "parent;" whether the parent deals with the subsidiary "at arm's length;" impact of statutes on whether the entity is an arm of the state; entity's degree of local autonomy; and the entity's concern primarily with local, as opposed to statewide, problems.

13

Although the balance of "formalities factors" and some of the "operational factors" may be consistent with Turkmenneft's existence as an independent and self-supporting entity, the court's skepticism about Turkmenneft's arm's-length status is critical. The Government manipulated Turkmenneft legally and economically to repudiate the contract with Bridas and then render it impossible for Bridas to collect damages. This conclusion is reinforced by the court's brief but revealing review of the "finances" factors.[10] As the court noted, not only was the Turkmenian Party financed by the Government, but when the Government created Turkmenneft as the Turkmenian Party's successor, Turkmenneft was grossly under-capitalized with the equivalent of $17,000 U.S., a paltry sum to finance oil and gas exploration and production. The court noted the absence of any financial statement or balance sheet for Turkmenneft, whether under U.S. or local law. Turkmenneft's revenues were diverted to a State Oil and Gas Fund that also collected revenues from other state-owned entities. Although the Government contends that the joint venture, not the Government, paid the joint venture's salaries and expenses, Turkmenneft's costs of arbitration have been paid entirely from the State Fund. The court accordingly found that Turkmenneft was not financially

---

[10] The "finances" factors include whether: the parent and subsidiary file consolidated financial statements; the parent finances the subsidiary; the subsidiary operated with grossly inadequate capital; the parent pays salaries and other expenses of the subsidiary; others pay or guarantee debts of the dominated corporation; and the source of the entity's funding.

14

independent from the Government and that the Government used the lack of financial separateness "to commit a fraud or another wrong on plaintiffs."

With this conclusion, we concur. Undercapitalization is often critical in alter ego analysis. Gardemal v. Westin Hotel Co., 186 F.3d 588, 594 (5th Cir. 1999); see also, Trs. of the Nat'l Elevator Indus. Pension, Health Benefit & Educ. Funds v. Lutyk, 332 F.3d 188, 198 (3d Cir. 2003). The fact that Turkmenneft owned producing rights and equipment that it contributed to the joint venture does not in this case support a claim of financial separateness, because such resources could only carry value if the venture were allowed to keep its own revenues, which it was not. Further, the Government changed the law to prevent Turkmenneft's assets from being seized by a creditor such as Bridas, after the initiation of arbitration proceedings. The fact that a subsidiary maintains what amounts to a "zero balance," and relies exclusively upon another entity to service its debts, is strong evidence that the subsidiary lacks an independent identity. Hystro Prods., Inc. v. MNP Corp., 18 F.3d 1384, 1389 (7th Cir. 1994); see also Nat'l Elevator Indus., 332 F.3d at 198 (noting that an "element of injustice or fundamental unfairness" is present where incoming revenues are directed away from an undercapitalized corporation and into the hands of the controlling party).

Despite some indicia of separateness, the reality was that when the Government's export ban forced Bridas out of the

15

joint venture, the Government then exercised its power as a parent entity to deprive Bridas of a contractual remedy. Intentionally bleeding a subsidiary to thwart creditors is a classic ground for piercing the corporate veil. It is true that the standard for this equitable remedy should be more stringent in breach of contract cases, because the creditor has willingly transacted business with a subsidiary and, as here, forewent the opportunity to obtain a guarantee of Turkmenneft's debts by the Government. The standard is met in this case, however, because Turkmenneft assumed full responsibility for its obligations under the joint venture. The Government, as Turkmenneft's owner, made it impossible for the objectives of the joint venture to be carried out.

In this rare case, we are compelled to reverse the district court's finding and conclude that the Government acted as the alter ego of Turkmenneft in regard to this Joint Venture Agreement with Bridas.

Accordingly, the judgment of the district court is **REVERSED,** and **JUDGMENT RENDERED** for Bridas authorizing enforcement of the arbitration award.