REVISED JANUARY 17, 2013

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

December 21, 2012

Lyle W. Cayce
Clerk

No. 12-30377

FIRST INVESTMENT CORPORATION OF THE MARSHALL ISLANDS,

Petitioner-Appellant

v.

FUJIAN MAWEI SHIPBUILDING, LIMITED, erroneously sued as
Fujian Mawei Shipbuilding, Limited of the People's Republic of China;
FUJIAN SHIPBUILDING INDUSTRY GROUP CORPORATION,
erroneously sued as Fujian Shipbuilding Industry Group Corporation
of the People's Republic of China; PEOPLE'S REPUBLIC OF CHINA

Respondents-Appellees

Appeal from the United States District Court
for the Eastern District of Louisiana

Before STEWART, Chief Judge, and KING and OWEN, Circuit Judges.

KING, Circuit Judge:

First Investment Corporation of the Marshall Islands appeals a district court's decision to deny confirmation of a foreign arbitral award against Fujian Mawei Shipbuilding Ltd., Fujian Shipbuilding Industry Group Corp., and the People's Republic of China. This case requires us to address an issue of first impression in this circuit: whether a court may dismiss a petition to confirm a foreign arbitration award for lack of personal jurisdiction under the United

Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards. For the reasons that follow we conclude that the district court's dismissal of the petition on personal jurisdiction grounds was appropriate. We similarly conclude that the district court properly dismissed the People's Republic of China for lack of subject matter jurisdiction. Accordingly, we affirm the district court's judgment.[1]

## I. FACTUAL AND PROCEDURAL BACKGROUND

On September 15, 2003, First Investment Corporation of the Marshall Islands ("First Investment") entered into a series of shipbuilding contracts with Fujian Shipbuilding Industry Group Corp. ("FSIGC") and Fujian Mawei Shipbuilding Ltd. ("Mawei"). FSIGC and Mawei (collectively, the "Fujian Entities") are Chinese companies. FSIGC is a Chinese state-owned entity, and Mawei is a private corporation of which FSIGC is a majority shareholder.

First Investment alleges that the Fujian Entities breached the contracts by refusing to honor an option agreement. Pursuant to a contractual arbitration clause, First Investment gave notice of arbitration to the Fujian Entities on May 3, 2004. An arbitration panel was duly constituted in London on June 18, 2004, under the rules of the London Maritime Arbitration Association. First Investment appointed Bruce Harris to the panel, and the Fujian Entities appointed Wang Sheng Chang. Harris and Wang then selected Professor J. Martin Hunter to complete the panel.

The arbitration concluded on September 17, 2005, at which time the arbitrators prepared a draft award in First Investment's favor. Professor Hunter expressed his belief that the panel would need to meet to deliberate before issuing a final award. After receiving a deliberations memorandum from

---

[1] A separate opinion will issue in Covington Marine Corporation, et al. v. Xiamen Shipbuilding Industry Company, Limited, No. 12-30383, which was consolidated for argument with the present case.

Wang, Professor Hunter prepared a first draft of the award, and circulated it to Wang and Harris. In February 2006, Wang sent Hunter his comments on the draft award, as well as a dissenting opinion. Professor Hunter again expressed his belief that in-person discussions would be necessary. Wang replied that he would agree to a final award by email, but that he would also be available to meet in London in April 2006. A second draft was then sent by Professor Hunter on March 25, 2006, to the other arbitrators for signature. Wang did not receive the second draft and did not respond, having been detained by the People's Republic of China ("PRC") on charges of bribery and secret distribution of state-owned assets.[2] Hunter and Harris nevertheless proceeded to sign the award and attached Wang's dissent. The arbitration panel awarded First Investment approximately $26 million in damages.

First Investment then sought to confirm the award in Xiamen Maritime Court, in Fujian province, China pursuant to the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 38 (entered into force with respect to the United States Dec. 29, 1970) ("New York Convention"), implemented in 9 U.S.C. §§ 201, et seq. First Investment alleges that it encountered numerous difficulties in attempting to confirm its award. Chinese embassies in London and Athens refused to authenticate documents necessary for commencement of a confirmation proceeding in China. On October 23, 2006, First Investment learned that the PRC had instructed its embassy in Athens not to authenticate the documents. Although the embassy ultimately did authenticate the documents, this occurred only after the Greek government interceded and filed a formal protest. First Investment's difficulties continued after it commenced a confirmation and enforcement proceeding in Xiamen on August 1, 2006. First

---

[2] The Fujian Entities represent that Wang has since been convicted and is serving a five-year prison term.

Investment contends that it was not permitted the assistance of its Chinese counsel at a hearing on July 13, 2007. In addition, First Investment was denied the aid of a competent translator, and was instead assigned an interpreter with no legal experience and a limited legal vocabulary.

On May 11, 2008, the Chinese court issued an order denying enforcement. The Chinese court determined that the arbitral tribunal was not in accordance with the agreement signed by the parties, which allegedly required that each member of the tribunal fully participate in the arbitration proceeding. Accordingly, the Chinese court held that, because Wang never reviewed the final draft of the decision, the award could not be confirmed pursuant to Article V of the New York Convention.

First Investment commenced a second confirmation proceeding on May 27, 2009, this time in the United States District Court for the Eastern District of Louisiana, against the Fujian Entities, as well as the PRC. The district court entered a default judgment against the Fujian Entities and the PRC on January 26, 2010, which was vacated on motion for improper service on August 9, 2010. The district court entered a second default judgment against the Fujian Entities and the PRC on March 22, 2011. The Fujian Entities filed a motion for reconsideration on April 15, 2011, and a motion to dismiss or, in the alternative, to refuse to confirm the arbitral award, on July 12, 2011. The district court granted Fujian's motion for reconsideration and vacated the default judgment against the Fujian Entities on June 28, 2011. The district court also granted the motion to dismiss for lack of personal jurisdiction on March 12, 2012. In the same order, the district court dismissed First Investment's petition against the PRC for lack of subject matter jurisdiction.

First Investment filed a timely notice of appeal on April 11, 2012.

## II. DISCUSSION

### A. Personal Jurisdiction

The district court dismissed First Investment's petition against the Fujian Entities for lack of personal jurisdiction. We review de novo a district court's determination that it lacks personal jurisdiction. Pervasive Software, Inc. v. Lexware GmbH & Co. KG, 688 F.3d 214, 219 (5th Cir. 2012). The burden of establishing jurisdiction rests with the party seeking to invoke the court's power, but it need only present prima facie evidence. Seiferth v. Helicopteros Atuneros, Inc., 472 F.3d 266, 270 (5th Cir. 2006). "In determining whether a prima facie case exists, this Court must accept as true [the Plaintiff's] uncontroverted allegations, and resolve in [its] favor all conflicts between the [jurisdictional] facts contained in the parties' affidavits and other documentation." Freudensprung v. Offshore Technical Servs., Inc., 379 F.3d 327, 343 (5th Cir. 2004) (alterations in original) (quoting Nuovo Pignone, SpA v. STORMAN ASIA M/V, 310 F.3d 374, 378 (5th Cir. 2002)) (internal quotation marks omitted).

On appeal, First Investment does not contend that, under a traditional due process analysis, the district court had personal jurisdiction over the Fujian Entities. Instead, First Investment argues that the Fujian Entities, as foreign entities with no contacts in the United States, were not entitled to the protections of the Fifth Amendment's Due Process Clause. First Investment further asserts that personal jurisdiction is not a valid defense under the New York Convention. Finally, First Investment argues that because the Fujian Entities were alter egos of the PRC, a foreign state over which personal jurisdiction was not required, the district court was wrong to dismiss the Fujian Entities.

We consider each of First Investment's arguments in turn.

1.    Foreign Entities

First Investment argues that foreign entities that are neither present nor have property in the United States are not entitled to due process protections. We find no support for this proposition in current caselaw. The decisions First Investment relies on are clarified by later circuit decisions or are superseded by the Supreme Court's recent decision in Goodyear Dunlop Tires Operations, S.A. v. Brown, 131 S. Ct. 2846 (2011).

The first case First Investment relies on is People's Mojahedin Organization of Iran v. U.S. Department of State, in which the court held that "[a] foreign entity without property or presence in [the United States] has no constitutional rights, under the [D]ue [P]rocess [C]lause or otherwise." 182 F.3d 17, 22 (D.C. Cir. 1999). But that holding was recently clarified by the D.C. Circuit in GSS Group Ltd. v. National Port Authority, where the court reasoned that "[w]hen a foreign corporation is summoned into court, it is being forced to defend itself" and "[i]n opposing personal jurisdiction on due process grounds the corporation, through its attorney, makes itself present." 680 F.3d 805, 816 (D.C. Cir. 2012) (citing Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)). Thus, having "been forced to appear in the United States . . . [the foreign corporation] is entitled to the protection of the Due Process Clause." Id. (citing Zadvydas v. Davis, 533 U.S. 678, 693 (2001)).[3] The GSS Group court ultimately did not have to rely on this reasoning because the Supreme Court had already reaffirmed that foreign corporations are entitled to due process protections, regardless of whether they have contacts with the United States. Id. at 816-17 (citing Goodyear, 131 S. Ct. at 2853).

_____

[3] Alternatively, the court reasoned that due process protections might attach because "when a United States court exercises jurisdiction over a foreign corporate defendant it inflicts damage on that defendant . . . in the United States." GSS Grp., 680 F.3d at 816.

First Investment next relies on Al Haramain Islamic Foundation, Inc. v. U.S. Department of Treasury, 686 F.3d 965 (9th Cir. 2012). There, the court observed that "many (and likely most) of the designated persons [in this case] are not United States citizens or entities" and so "[m]any of those persons likely cannot assert the due process protections that are available to . . . a United States entity." Id. at 984 (citing Nat'l Council of Resistance of Iran v. Dep't of State, 251 F.3d 192, 201 (D.C. Cir. 2001)). The Al Haramain court did not, however, discuss the Supreme Court's decision in Goodyear, which we find controlling here.

The Goodyear Court addressed whether "foreign subsidiaries of a United States parent corporation [are] amenable to suit in state court on claims unrelated to any activity of the subsidiaries in the forum State[.]" 131 S. Ct. at 2850. The Court held that because the district court lacked both specific and general jurisdiction, the court could not exercise personal jurisdiction over the subsidiaries. Id. at 2851. By engaging in a minimum contacts analysis where the foreign entities were not registered in the forum state, did not solicit business there, and did not design, manufacture, or advertise products in the forum state, the Court made clear that such foreign corporations could avail themselves of the protections of the Due Process Clause. Id. at 2852-54; see also GSS Grp., 680 F.3d at 813 ("Both the Supreme Court and this court have repeatedly held that foreign corporations may invoke due process protections to challenge the exercise of personal jurisdiction over them.").

Thus, there is no basis to conclude that a party's status as a foreign entity permits a court to ignore personal jurisdiction or exercise such jurisdiction without first establishing sufficient contacts between the defendant and the forum state.

### 2. The New York Convention

First Investment next argues that a party against whom confirmation of a foreign arbitral award is sought under the New York Convention cannot raise a personal jurisdiction defense. First Investment points out that the New York Convention expressly provides for seven grounds on which confirmation may be denied and that personal jurisdiction is not among the listed grounds. First Investment further observes that an action to confirm an award under the New York Convention is a summary proceeding that does not impact a defending party's rights and thus it is unnecessary for a court to have personal jurisdiction.

We have previously declined to rule on whether dismissal of a confirmation action would be proper on personal jurisdiction grounds. Gulf Petro Trading Co. v. Nigerian Nat'l Petrol. Corp., 512 F.3d 742, 753 (5th Cir. 2008) (King, J.). With the question squarely before us, we hold, in accordance with the decision of every circuit to have considered this issue, that dismissal of a petition under the New York Convention for lack of personal jurisdiction is appropriate as a matter of constitutional due process.

"The New York Convention provides a carefully structured framework for the review and enforcement of international arbitral awards." Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara, 364 F.3d 274, 287 (5th Cir. 2004). The New York Convention creates two different review regimes for arbitral awards depending on whether a recognition or enforcement action is brought in the country in which, or under the law of which, the award was made or in another country. Gulf Petro Trading Co., 512 F.3d at 746. The first is deemed to have "primary jurisdiction over the award," whereas the second has "secondary jurisdiction." Id. (citation omitted). A court of primary jurisdiction is "free to set aside or modify an award in accordance with [the country's] domestic arbitral law and its full panoply of express and implied grounds for relief." Id. (alteration in original) (quoting Yusuf Ahmed Alghanim & Sons v.

8

Toys "R" Us, Inc., 126 F.3d 15, 23 (2d Cir. 1997)). For courts with secondary jurisdiction "Article V [of the New York Convention] enumerates the [seven] exclusive grounds on which a court . . . may refuse recognition and enforcement of an award." Id. at 747.[4] Upon a motion to confirm an arbitral award under the New York Convention, a court "shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention." 9 U.S.C. § 207.

---

[4] Article V of the New York Convention provides that:

1. Recognition and enforcement of the award may be refused, at the request of the party against whom it is invoked, only if that party furnishes to the competent authority where the recognition and enforcement is sought, proof that:

(a) The parties to the agreement . . . were, under the law applicable to them, under some incapacity, or the said agreement is not valid under the law to which the parties have subjected it or, failing any indication thereon, under the law of the country where the award was made; or

(b) The party against whom the award is invoked was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings or was otherwise unable to present his case; or

(c) The award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration . . .; or

(d) The composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties, or, failing such agreement, was not in accordance with the law of the country where the arbitration took place; or

(e) The award has not yet become binding on the parties, or has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made.

2. Recognition and enforcement of an arbitral award may also be refused if the competent authority in the country where recognition and enforcement is sought finds that:

(a) The subject matter of the difference is not capable of settlement by arbitration under the law of that country; or

(b) The recognition or enforcement of the award would be contrary to the public policy of that country.

Personal jurisdiction is not listed as a ground on which confirmation may be denied. Nevertheless, the fact that a treaty and its implementing legislation do not specify that a petition may be dismissed for lack of personal jurisdiction is not dispositive. No less than subject matter jurisdiction—which is a ground to deny enforcement under the New York Convention—personal jurisdiction "is 'an essential element of the jurisdiction of a district . . . court,' without which the court is 'powerless to proceed to an adjudication.'" Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574, 584 (1999) (quoting Emp'rs Reinsurance Corp. v. Bryant, 299 U.S. 374, 382 (1937)) (omission in original). Personal jurisdiction "represents a restriction on judicial power . . . as a matter of individual liberty." Id. at 584 (quoting Ins. Corp. of Ir. v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 702 (1982)). Requiring a court to have personal jurisdiction over a party as a matter of constitutional due process "protects an individual's liberty interest in not being subject to the binding judgment of a forum with which he has established no meaningful 'contacts, ties, or relations.'" ITL Int'l, Inc. v. Constenla, S.A., 669 F.3d 493, 498 (5th Cir. 2012) (quoting Int'l Shoe Co., 326 U.S. at 319). A party's contacts with a forum must be sufficient for the party to "reasonably anticipate being haled into court there." World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980).

Even though the New York Convention does not list personal jurisdiction as a ground for denying enforcement, the Due Process Clause requires that a court dismiss an action, on motion, over which it has no personal jurisdiction. See Pervasive Software, Inc., 688 F.3d at 220-21. Because the New York Convention, through its implementing legislation, is an exercise of presidential and congressional power, whereas personal jurisdiction is grounded in constitutional due process concerns, there can be no question that the Constitution takes precedence. Amaya v. Stanolind Oil & Gas Co., 158 F.2d 554, 556 (5th Cir. 1947) ("The treaty-making power does not extend '[s]o far as to

authorize what the [C]onstitution forbids.'" (quoting Geofroy v. Riggs, 133 U.S. 258, 267 (1890))). Congress could no more dispense with personal jurisdiction in an action to confirm a foreign arbitral award than it could under any other statute. See Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co., 284 F.3d 1114, 1122 (9th Cir. 2002) (citing United States v. Buckland, 277 F.3d 1173, 1179 (9th Cir. 2002) (en banc)) (interpreting statute to require personal jurisdiction because dispensing with such a requirement would raise question of statute's constitutionality). Regardless of Congress's intent in failing explicitly to include a personal jurisdiction requirement, a court is not thereby relieved of its responsibility to enforce those constitutional protections that guard a party from appearing in a forum with which it has no contacts.

Those circuits that have considered this issue agree. Frontera Res. Azer. Corp. v. State Oil Co. of Azer. Rep., 582 F.3d 393, 397-98 (2d Cir. 2009) (confirmation proceeding under New York Convention requires personal or quasi in rem jurisdiction over parties); Telcordia Tech Inc. v. Telkom SA Ltd., 458 F.3d 172, 178-79 (3d Cir. 2006) (observing that "the New York Convention does not diminish the Due Process constraints in asserting jurisdiction over a nonresident alien"); Base Metal Trading, Ltd. v. OJSC "Novokuznetsky Aluminum Factory", 283 F.3d 208, 212 (4th Cir. 2002) ("[W]hile the [New York] Convention confers subject matter jurisdiction over actions brought pursuant to the Convention, it does not confer personal jurisdiction when it would not otherwise exist."); Glencore Grain, 284 F.3d at 1121; see also S & Davis Int'l, Inc. v. Republic of Yemen, 218 F.3d 1292, 1303-05 (11th Cir. 2000); Emp'rs Ins. of Wausau v. Banco De Seguros Del Estado, 199 F.3d 937, 941-43 & n.1 (7th Cir. 1999) (requiring personal jurisdiction in dispute arising under Inter-American Convention on International Commercial Arbitration, but observing that result would be the same under New York Convention).

The Glencore Grain court provided the most complete analysis for why suits under the New York Convention are still constrained by personal jurisdiction. As here, the plaintiff in that case argued that, because personal jurisdiction was not listed as one of the New York Convention's seven defenses to recognition and enforcement of a foreign arbitral award, dismissal for lack of personal jurisdiction was improper. 284 F.3d at 1120-21. The court rejected that argument as misunderstanding a court's obligation to have jurisdiction over both the character of the controversy and the parties. Id. at 1121. As the court explained, jurisdiction over subject matter comes from Article III, Section 2, Clause 1 of the Constitution, as well as through congressionally-conferred statutory grants of jurisdiction, while personal jurisdiction is based exclusively on the Due Process Clause. Id. (quoting Ins. Corp. of Ir., 456 U.S. at 701-02). Consequently, it was irrelevant that the New York Convention and its implementing legislation lacked an explicit personal jurisdiction requirement. Id. ("We hold that neither the [New York] Convention nor its implementing legislation removed the district courts' obligation to find jurisdiction over the defendant in suits to confirm arbitration awards.").

We are not persuaded that First Investment's argument that a party's "substantive rights" are unaffected by a confirmation proceeding overcomes the constitutional concerns here implicated. First Investment contends that because it is only seeking to confirm an award, not enforce it, the Fujian Entities' rights are not implicated, and dismissal on personal jurisdiction grounds is improper.

First Investment misunderstands the significance of confirming an award. Before the New York Convention, a party seeking to enforce an arbitration award outside the jurisdiction in which it was rendered might have to petition a domestic court for permission. Oriental Commercial & Shipping Co., (U.K.) v. Rosseel, N.V., 769 F. Supp. 514, 516 (S.D.N.Y. 1991). With the advent of the New York Convention, a party may now directly seek enforcement in a foreign

12

jurisdiction by applying for an enforcement order by that jurisdiction's courts. Id. But this has also opened the door to a party wholly avoiding the New York Convention by converting the confirmation of an award into a court judgment that may be enforced abroad as a foreign judgment. Id. at 516 n.3; see also Waterside Ocean Navigation Co. v. Int'l Navigation, Ltd., 737 F.2d 150, 154 (2d Cir. 1984) ("[W]e have held that the [New York] Convention applies only to the enforcement of a foreign arbitral award and not to the enforcement of foreign judgments confirming foreign arbitral awards." (citation and internal quotation marks omitted)).

Accordingly, although confirming an award may be a "summary proceeding," it is inaccurate to say that a party's rights are not affected. Confirming an award makes it enforceable in the jurisdiction in which it was confirmed. Confirmation may result in a party losing the opportunity to raise defenses to enforcement that it might have raised at the confirmation stage. See Ocean Warehousing B.V. v. Baron Metals & Alloys, Inc., 157 F. Supp. 2d 245, 249-51 & n.8 (S.D.N.Y. 2001) (holding foreign court judgment confirming arbitral award enforceable although doing so might preclude party from raising defenses to confirmation it could have previously raised under New York Convention). Confirming an award also makes it possible that a party, armed with a court judgment, will seek to enforce the award as a foreign judgment elsewhere. This may, for example, permit a party to circumvent the New York Convention's three-year statute of limitations. See Seetransport Wiking Trader Schiffahrtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala, 29 F.3d 79, 80-82 (2d Cir. 1994) (holding that decree by foreign court rejecting application to annul an arbitral award was an enforceable foreign judgment even where statute of limitations for enforcing award under New York Convention had run). It may also permit an enforcing party to entirely avoid the New York Convention's Article V defenses. Ocean Warehousing B.V., 157 F.

Supp. 2d at 249 ("The Convention defenses simply do not apply to [a state law] proceeding seeking recognition and enforcement of a foreign judgment, even if that judgment was based on a foreign arbitral award."); cf. Schlumberger Tech. Corp. v. United States, 195 F.3d 216, 220 (5th Cir. 1999) (noting that "defenses to confirming a foreign arbitral award are broader than those available when enforcing domestic judgments under full faith and credit").[5]

First Investment is thus incorrect that a confirmation proceeding does not affect a party's rights. Moreover, even if we agreed with First Investment's argument, this would do nothing to alleviate the constitutional protections that enable a party to defend itself against being called into court in a jurisdiction with which the party has no contacts.[6]

---

[5] Tellingly, counsel for First Investment was exceedingly hesitant at oral argument to explain why First Investment opted to bring only a confirmation action in the United States. Counsel repeatedly declined to answer why First Investment initiated a confirmation proceeding in the United States, as opposed to the United Kingdom, where the arbitration took place and where the Fujian Entities presumably had property, notwithstanding First Investment's assertion that establishing an alter ego relationship with the PRC would allow First Investment to seize China's ocean-going vessels or touring pandas.

[6] We also reject any argument that the Fujian Entities were on notice that they might be haled into court in the United States, having willingly submitted to arbitration in the United Kingdom. The D.C. Circuit considered, and rejected, a similar argument in Creighton Ltd. v. Government of the State of Qatar, 181 F.3d 118 (D.C. Cir. 1999). There, a contractor sought to enforce an arbitration award against Qatar and argued that, by agreeing to arbitrate in France, a party to the New York Convention, Qatar impliedly waived its sovereign immunity and any due process objections related to personal jurisdiction. Id. at 122, 125. The court disagreed and held that a party's agreement to arbitration in a jurisdiction could only be understood as waiving jurisdictional arguments for that jurisdiction. Id. at 126. As that court observed by analogy to the Full Faith and Credit Clause:

> It is implausible that a defendant in Connecticut who agreed to arbitrate . . . in New York, and thereby implicitly waived any objection to personal jurisdiction . . . in New York . . ., also waived its objection to personal jurisdiction in such an action brought in California merely because the [F]ull [F]aith and [C]redit [C]lause would make a valid New York judgment enforceable in the courts of California.

Id.

3.    Alter Ego Theory

First Investment's final argument against dismissal of the Fujian Entities for lack of personal jurisdiction is that the Fujian Entities were alter egos of the PRC.   First Investment contends that because a court need not establish personal jurisdiction over a foreign sovereign, it was also error to dismiss that foreign sovereign's alter egos for lack of jurisdiction.  As did the district court, we assume, without deciding, that a foreign sovereign cannot raise a personal jurisdiction defense as it is not a "person" under the Due Process Clause.  Price v. Socialist People's Libyan Arab Jamahiriya, 294 F.3d 82, 96-97 (D.C. Cir. 2002) (reasoning that foreign states, like States of the Union, are not "persons" under the Fifth Amendment); see also Frontera Res. Azer. Corp., 582 F.3d at 399 (adopting reasoning in Price).  Accordingly, if First Investment successfully establishes that either of the Fujian Entities were alter egos of the PRC then it would be improper for the district court to dismiss that party for lack of personal jurisdiction.

First National City Bank v. Banco Para El Comercio Exterior de Cuba, 462 U.S. 611 (1983) ("Bancec") "remains the seminal case on the circumstance under which American courts may disregard the separate status of instrumentalities created by foreign governments."  Walter Fuller Aircraft Sales, Inc. v. Republic of Philippines, 965 F.2d 1375, 1381 (5th Cir. 1992) (King, J.); see also GSS Grp., 680 F.3d at 816 ("Bancec is the exclusive means for determining whether a foreign, state-owned corporation is a 'person' for Fifth Amendment purposes."). Under Bancec, "duly created instrumentalities of a foreign state are to be accorded a presumption of independent status." 462 U.S. at 627.  "A plaintiff can over come [sic] that presumption, however, in certain circumstances by demonstrating that the instrumentality is the agent or alter ego of the foreign state."  Dale v. Colagiovanni, 443 F.3d 425, 429 (5th Cir. 2006).  While not establishing any "mechanical formula," the Bancec Court did list a non-

15

exhaustive list of factors to consider in determining whether the presumption in favor of an entity's separate juridical identity had been overcome. 462 U.S. at 633. "[W]e look to the ownership and management structure of the instrumentality, paying particularly close attention to whether the government is involved in day-to-day operations, as well as the extent to which the agent holds itself out to be acting on behalf of the government." Walter Fuller, 965 F.2d at 1382 (citing Hester Int'l Corp. v. Federal Republic of Nigeria, 879 F.2d 170, 178, 181 (5th Cir. 1989)).[7] Finally, we consider the equitable principles discussed in Bancec, "particularly the principle of disregarding the corporate form in instances where respecting it would lead to injustice." Id. First Investment argues that the district court did not sufficiently heed Bancec's instruction that an instrumentality should not be considered a separate legal

---

[7] Subsequently, this court has also instructed district courts to consider "those factors normally explored in the context of parent-subsidiary alter ego claims." Bridas S.A.P.I.C. v. Gov't of Turkm., 345 F.3d 347, 360 n.11 (5th Cir. 2003) ("Bridas I"). These include whether:

> (1) the parent and subsidiary have common stock ownership; (2) the parent and subsidiary have common directors or officers; (3) the parent and subsidiary have common business departments; (4) the parent and subsidiary file consolidated financial statements; (5) the parent finances the subsidiary; (6) the parent caused the incorporation of the subsidiary; (7) the subsidiary operated with grossly inadequate capital; (8) the parent pays salaries and other expenses of subsidiary; (9) the subsidiary receives no business except that given by the parent; (10) the parent uses the subsidiary's property as its own; (11) the daily operations of the two corporations are not kept separate; (12) the subsidiary does not observe corporate formalities.

Id.

A court can also consider "(1) whether the directors of the 'subsidiary' act in the primary and independent interest of the 'parent,'; (2) whether others pay or guarantee debts of the dominated corporation; and (3) whether the alleged dominator deals with the dominated corporation at arms length." Id. Finally, a court can also consider:

> (1) whether state statutes and case law view the entity as an arm of the state; (2) the source of the entity's funding; (3) the entity's degree of local autonomy; (4) whether the entity is concerned primarily with local, as opposed to statewide, problems; (5) whether the entity has the authority to sue and be sued in its own name; and (6) whether the entity has the right to hold and use property.

Id.

entity when doing so would result in fraud or injustice. First Investment further contends that the district court improperly emphasized the need for a foreign state to exercise control over an instrumentality's daily activities without fully considering the totality of the circumstances. Applying the considerations in Bancec to each of the Fujian Entities we conclude that the district court did not err in determining that First Investment has not overcome the presumption in favor of FSIGC and Mawei's separate juridical identity.

          i.     FSIGC

The district court considered declarations by Wang Darong and Lin Jiang, each a partner in a separate Chinese law firm. The Wang and Lin declarations established that FSIGC was wholly-owned by the PRC, and that a branch of the PRC appoints FSIGC's board of directors and senior management personnel, and exercises the rights of a shareholder. The Wang and Lin declarations also conceded, however, that FSIGC possessed operational and managerial authority. The district court also considered the declaration of the vice-director of FSIGC's legal department, who stated that FSIGC's employees were paid by FSIGC, not the PRC; FSIGC filed independent financial statements; the PRC did not provide any funding apart from that raised by selling shares; FSIGC's directors acted in the best interest of the company; FSIGC was responsible for its own debts, which were not paid or guaranteed by the PRC; FSIGC dealt with the PRC in arm's-length transactions; and FSIGC managed its own daily operations apart from the PRC.

There is no question that this evidence, considered alone, would not satisfy Bancec's standard for finding an alter ego relationship between a foreign state and its instrumentality. As we have previously determined, the mere fact that a government owns 100% of a company's stock is not sufficient to establish control. Id. at 1382 & n.11. The declarations also provide no indication that FSIGC's officers were acting in the PRC's interests and controlling FSIGC's day-

to-day operations on the PRC's behalf. Nor do the declarations evidence any injustice that would flow from respecting FSIGC's corporate form.

First Investment's only argument in response is that the district court did not consider the declaration of Evan Breibart. That declaration shows that First Investment encountered many obstacles in confirming its arbitral award in China. These include the PRC's London and Athens embassies following the PRC's instructions not to authenticate documents necessary to initiate a confirmation proceeding in China. A formal protest by the Greek Deputy Foreign Minister led to the documents being authenticated, but delays continued. Following commencement of the confirmation proceeding in China, First Investment's attorney and interpreter, as well as an employee of the Greek consulate, were denied entry into the hearing without explanation. First Investment was instead provided with a student interpreter from a local university who could not provide an adequate interpretation of the hearing. Finally, Wang, whose declaration First Investment submitted to the district court, later stated that he would be moving to China's Fujian province, and that, as a result, it would be "inconvenient for him if the declaration was used in an enforcement proceeding against PRC state owned assets." Nearly all the Chinese experts First Investment has approached since then have refused to provide a declaration in First Investment's support for fear of negative repercussions by the PRC.

Whatever this evidence says about the PRC's hostility towards foreign entities, it does not demonstrate the level of control necessary to overcome the presumption in favor of FSIGC's separate identity. The Breibart declaration does not show that the PRC exercised control over FSIGC. None of the allegations even relate to FSIGC's management, but instead relate to actions by the PRC's embassies and courts. First Investment's allegations fall far short of the type of control necessary to establish an alter ego relationship. See, e.g.,

Bridas S.A.P.I.C. v. Government of Turkmenistan, 447 F.3d 411, 419-20 (5th Cir. 2006) ("Bridas II") (alter ego relationship established where government manipulated undercapitalized corporation to repudiate contract, paid arbitration costs, diverted corporation's revenues into state oil and gas fund, and changed law to prevent seizure of corporation's assets); S & Davis Int'l, Inc., 218 F.3d at 1299-300 (corporation was alter ego of government ministry where corporation was wholly owned by government, ministry ordered corporation to breach contract, and ministry failed to submit evidence that corporation was independent entity, including papers of incorporation, status of employees as public or private servants, or separation of assets).

Nor has First Investment presented equitable considerations sufficient to disregard FSIGC's corporate identity. For First Investment to meet this prong it is not sufficient for it merely to point out an injustice that would result from an adverse decision. Rather, First Investment must show how the PRC manipulated FSIGC's corporate form to perpetuate a fraud or injustice. See Bridas II, 447 F.3d at 417 (imposition of export ban was exercise of sovereign powers that may have constituted a wrong to plaintiff, but "was not a wrong based on misuse of the corporate organizational form"). Here, First Investment has failed to show that the PRC used FSIGC's corporate form to manipulate circumstances in such a way as to do something it otherwise would not have been able to do. First Investment has also not shown that the PRC is shielding FSIGC from an adverse arbitral award because the real burden of such an award would fall on the PRC. The only evidence First Investment puts forward is that the PRC is FSIGC's sole shareholder. As already stated, this is insufficient to establish an alter ego relationship. Hester, 879 F.2d at 181. Were we to accept First Investment's argument we would effectively wipe out the presumption of separateness. Following First Investment's logic, anytime a foreign sovereign owned the majority of shares in a company, and took any action that assisted

19

that company, it would provide grounds for ignoring that company's separate juridical identity. See id. (describing 100% ownership and appointment of board of directors as characteristics of a "typical government instrumentality").

Nor is the PRC committing a fraud against First Investment. Although the PRC may have delayed initiation of the confirmation proceeding, First Investment ultimately did bring such an action in China. Moreover, the Chinese court provided a reasoned opinion that denied enforcement on the ground that the panel's third arbitrator did not approve the final draft.

Accordingly, the district court correctly concluded that there did not exist an alter ego relationship between FSIGC and the PRC, and properly dismissed FSIGC for lack of personal jurisdiction.

ii.     Mawei

Evidence of the PRC's control over Mawei is even more attenuated than that over FSIGC and is also dependent on there being an alter ego relationship between FSIGC and the PRC. The aforementioned Wang and Lin declarations only show that FSIGC directly owns 56.21% of Mawei's total share capital. FSIGC also effectuated Mawei's reconstruction and the two companies share senior management personnel. Just as the PRC's 100% ownership of FSIGC is insufficient to establish the necessary degree of control under Bancec, so too is FSIGC's majority share ownership of Mawei not enough to demonstrate that the PRC, through FSIGC, controlled Mawei and create an alter ego relationship. See Walter Fuller, 965 F.2d at 1382 & n.11. For reasons already discussed, First Investment has also not shown that the PRC manipulated Mawei's corporate form to commit a fraud or injustice. As with FSIGC, the district court did not err in dismissing Mawei for lack of personal jurisdiction after concluding that there was no alter ego relationship between Mawei and the PRC.[8]

---

[8] The district court also denied jurisdictional discovery because First Investment failed to allege facts that, if true, would establish jurisdiction. First Investment does not raise this

B.    Subject Matter Jurisdiction

Pursuant to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1604, a "foreign state shall be immune from the jurisdiction of the courts of the United States and of the States" unless one of several statutorily defined exceptions applies. The district court correctly recognized, and the parties do not dispute, that the only potentially applicable exception is § 1605(a)(6)'s arbitration exception. Under that provision, foreign states are considered to have waived their sovereign immunity in cases

> to enforce an agreement made by the foreign state with or for the benefit of a private party to submit to arbitration all or any differences which have arisen or which may arise between the parties with respect to a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration under the laws of the United States, or to confirm an award made pursuant to such an agreement to arbitrate . . . .

28 U.S.C. § 1605(a)(6).

The PRC was not, however, a party to the arbitration agreement between First Investment and the Fujian Entities. The district court thus considered whether the PRC could be bound to the arbitration agreement through the Fujian Entities. For the same reasons it concluded that the Fujian Entities were not alter egos of the PRC, the district court concluded that the PRC could not be bound to the agreement. Accordingly, the district court held that the arbitration exception in § 1605(a)(6) did not apply and that it lacked subject matter jurisdiction over First Investment's petition against the PRC.

---

issue on appeal. Accordingly, we need not consider it. We only note, in passing, that even were we to consider the district court's discovery rulings we would find no error. A district court's discovery rulings are reviewed for abuse of discretion. Moore v. Willis Indep. Sch. Dist., 233 F.3d 871, 876 (5th Cir. 2000). The allegations discussed above fall far short of the "specific facts" we have required for allowing discovery into a foreign sovereign's activities. Arriba Ltd. v. Petroleos Mexicanos, 962 F.2d 528, 537 n.17 (5th Cir. 1992).

We review a district court's dismissal for lack of subject matter jurisdiction de novo. Choice Inc. of Tex. v. Greenstein, 691 F.3d 710, 714 (5th Cir. 2012). First Investment raises subject matter jurisdiction as an issue on appeal, but does not further discuss it. Nevertheless, we understand First Investment's argument on subject matter jurisdiction to be identical to its personal jurisdiction argument. Thus, if First Investment can establish an alter ego relationship between the Fujian Entities and the PRC then the PRC can be bound to the arbitration agreement to which the Fujian Entities are a party. See Bridas II, 447 F.3d at 413, 415 (corporation that was foreign state's alter ego could bind non-signatory foreign state to arbitration agreement).

As discussed, supra, First Investment cannot meet Bancec's standard for establishing an alter ego relationship. Having raised no other ground on which to find subject matter jurisdiction over the PRC, this conclusion is fatal to First Investment's petition. Accordingly, we affirm the district court's dismissal of the PRC for lack of subject matter jurisdiction.[9]

## III. CONCLUSION

For the foregoing reasons, the district court's judgment is AFFIRMED in all respects.

---

[9] Because we affirm the district court's decision that First Investment has failed to establish an alter ego relationship between the Fujian Entities and the PRC we do not reach the Fujian Entities' arguments that we should dismiss First Investment's appeal for insufficient briefing or because consideration of an alter ego theory is inappropriate at a confirmation proceeding.