# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| GULF LNG ENERGY, LLC and GULF LNG PIPELINE, LLC, | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | C.A. No. 2019-0460-AGB |
| ENI USA GAS MARKETING LLC, | ) ) ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted: September 11, 2019
Date Decided: December 30, 2019

Bradley R. Aronstam, S. Michael Sirkin, and R. Garrett Rice, ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; Joseph S. Allerhand, Seth Goodchild, and Tania C. Matsuoka, WEIL, GOTSHAL & MANGES LLP, New York, New York; Mark W. Friedman, William H. Taft V, Carl Micarelli, and Lisa Wang Lachowicz, DEBEVOISE & PLIMPTON LLP, New York, New York; *Attorneys for Plaintiffs Gulf LNG Energy, LLC and Gulf LNG Pipeline, LLC.*

Joseph B. Cicero and Gregory E. Stuhlman, CHIPMAN BROWN CICERO & COLE, LLP, Wilmington, Delaware; Joseph J. LoBue and Helene Gogadze, SHEPPARD, MULLIN, RICHTER & HAMPTON LLP, Washington, D.C.; *Attorneys for Defendant Eni USA Gas Marketing LLC*.

BOUCHARD, C.

In February 2019, this court entered an order and final judgment confirming an arbitration award in favor of Gulf LNG Energy, LLC and Gulf LNG Pipeline, LLC and against Eni USA Gas Marketing LLC for approximately $371.5 million. The judgment was the culmination of an arbitration proceeding that also resulted in the termination of a contract among the parties concerning Eni's use of a liquefied natural gas terminal in Mississippi that the Gulf entities constructed and own. Entry of the judgment, however, did not end the parties' legal entanglements.

In September 2018, the Gulf entities sued Eni's parent company in New York state court to enforce a payment guarantee. In June 2019, Eni began a second arbitration against the Gulf entities asserting two discrete claims for negligent misrepresentation and breach of contract. The filing of the second arbitration prompted this lawsuit, in which the Gulf entities seek entry of a permanent injunction to enjoin Eni from pursuing the second arbitration.

Pending before the court is the Gulf entities' motion for judgment on the pleadings. The motion brings to center stage two different lines of authority concerning the arbitration of disputes under the Federal Arbitration Act—one that allows courts to intervene to prevent collateral attacks on arbitration awards; the other that enforces the contractual intent of parties on questions of arbitrability. For the reasons explained below, the court reaches different conclusions as to Eni's two new claims in resolving the pending motion based on these two lines of authority.

1

First, the court finds that Eni's negligent misrepresentation claim in the second arbitration constitutes an impermissible collateral attack that seeks to undo the damages award from the first arbitration. Accordingly, as to that claim, the court grants the Gulf entities' motion and will enter a permanent injunction to enjoin Eni from pursuing the negligent misrepresentation claim in the second arbitration.

Second, the court finds that Eni's contract claim, which was pled but never decided in the first arbitration, does not amount to a collateral attack of the first arbitration award. Accordingly, as to that claim, the court denies the Gulf entities' motion and, in view of the broad arbitration clause in the parties' contract, leaves it to the tribunal in the second arbitration to determine whether that claim is arbitrable and, if so, whether the claim would be precluded based on the first arbitration.

## I. BACKGROUND

The facts recited in this opinion come from the parties' pleadings, documents incorporated therein, and the parties' submissions.[1] Unless otherwise noted, these facts are not in dispute.

### A. The Parties

Plaintiff Gulf LNG Energy, LLC, a Delaware limited liability company, owns and operates the liquefied natural gas ("LNG") terminal at the Pascagoula Facility

---

[1] Verified Complaint for Injunctive Relief (Dkt. 1); Defendant's Answer to Verified Complaint for Injunctive Relief (Dkt. 12).

2

in Mississippi.[2]  The purpose of the LNG terminal is to facilitate the import of LNG by ship into the United States.[3]  Plaintiff Gulf LNG Pipeline, LLC, a Delaware limited liability company, owns and operates a five-mile long pipeline that delivers and distributes natural gas from the Pascagoula Facility to downstream inland pipelines.[4]  This decision refers to Gulf LNG Energy, LLC and Gulf LNG Pipeline, LLC together as "Gulf" or the "Gulf entities."

Defendant Eni USA Gas Marketing LLC ("Eni"), a Delaware limited liability company, is in the business of marketing natural gas products and performing related services in the United States.[5]  Eni is an indirect subsidiary of Eni S.p.A., an Italian corporation in the oil and gas industry.[6]

## B.    The Terminal Use Agreement

On December 8, 2007, Gulf and Eni entered into the Terminal Use Agreement ("TUA"), which provided that Gulf would construct the Pascagoula Facility.[7]  Eni planned to use the Pascagoula Facility to receive, store, regasify, and deliver LNG to downstream pipelines in the United States.[8]  Under the TUA, Eni agreed to pay

---

[2] Answer ¶ 9.

[3] *Id.*

[4] *Id.* ¶ 10.

[5] *Id.* ¶ 11.

[6] *Id.*

[7] *Id.* ¶ 15; Compl. Ex. C ("TUA").

[8] Compl. ¶ 15.

3

Gulf various fees for the use of the Pascagoula Facility, including monthly fees known as "Reservation Fees" and "Operating Fees."[9]  The initial term of the TUA commenced on December 8, 2007 and runs for twenty years from the "Commercial Start Date."[10]

Gulf alleges it incurred substantial debt and spent over $1 billion to construct the Pascagoula Facility,[11] which became operational on October 1, 2011.[12]  Apart from an initial import of LNG when the Facility first became operational, Eni did not use the Pascagoula Facility.[13]

Five provisions in the TUA are relevant to the present dispute.  In Article 22.4(a), Gulf covenanted to "observe and comply with [Article 22.2(f)] in all respects."[14]  In Article 22.2(f), the Gulf entities represented and warranted that their "Constitutive Documents" will limit their purpose to, among other things, constructing, operating, and maintaining the Pascagoula Facility.[15]

---

[9] TUA Art. 11.1(b).

[10] *See id.* at 1, Arts. 1.32, 1.178.

[11] Compl. ¶ 16.

[12] Answer ¶ 16.

[13] *Id.*

[14] TUA Art. 22.4(a).

[15] *Id.* Art. 22.2(f).

4

Article 22.4(e) requires Gulf to receive "reasonable consideration" for any transaction it engages in with an "Affiliate."[16] Article 18.1 provides Eni with the right to terminate the TUA early if Gulf violates, among other provisions, Articles 22.4(a) or 22.4(e).[17] Finally, as discussed further below, Article 20.1(a) of the TUA contains a broad arbitration clause.[18]

## C.     Eni Initiates the First Arbitration Against Gulf

On March 2, 2016, Eni filed a notice of arbitration with the American Arbitration Association, International Centre for Dispute Resolution, asserting claims against Gulf (the "First Arbitration").[19] Eni's arbitration notice contended that, since the parties entered into the TUA, the natural gas market in the United States "has experienced radical change" due, in particular, to "the unforeseen, vast new production and supply of shale gas in the United States [that] made import of LNG into the United States economically irrational and unsustainable."[20]

In the First Arbitration, Eni sought, among other relief, (i) a declaration that "the essential purpose of the TUA has been frustrated and that the TUA has

---

[16] *Id.* Art. 22.4(e). "Affiliate" is defined to mean "a Person . . . that directly or indirectly controls, is controlled by, or is under common control with, another Person." *Id.* Art. 1.7.

[17] *Id.* Art. 18.1.

[18] *See* Part II.B.

[19] Dkt. 38.

[20] *Id.* ¶ 3.

5

terminated" because of a "fundamental and unforeseeable change in the United States natural gas/LNG market,"[21] and (ii) a declaration that Eni could terminate the TUA at any time under Article 18.1 because the Gulf entities "have breached the warranties and covenants set forth in at least Articles 22.4(a) and 22.4(e)" of the TUA.[22] With respect to its second requested declaration, Eni asserted that Gulf violated Article 22.4(a) because Gulf had filed an application to modify the pipeline to "accommodate the planned liquefaction and export activities" contrary to the representation in Article 22.4(a) that the "purpose and object" of the Gulf entities was limited "strictly to importation and regasification of LNG."[23]

On June 29, 2018, the arbitration tribunal ("the First Tribunal") issued its Final Award.[24] The First Tribunal held that "the principal purpose of the TUA has been substantially frustrated" and declared that the TUA was terminated as of March 1, 2016.[25] The First Tribunal ordered Eni to pay the Gulf entities $462,199,000 as "just compensation . . . for the value that their partial performance of the TUA conferred upon Eni."[26] This amount represents the sum of (i) restitution

---

[21] *Id.* ¶¶ 57, 59.

[22] *Id.* ¶ 64.

[23] *Id.* ¶¶ 48, 61.

[24] Compl. Ex. B ("Final Award").

[25] *Id.* ¶ 346.

[26] *Id.* ¶ 403.

for "Eni's proportionate share of the decommissioning costs" ($418,649,000) and (ii) 5% of the remaining TUA contract value ($43,550,000) as "compensation for all additional benefits conferred on Eni pursuant to the acquisition of the TUA capacity as part of the Angola Project."[27] Gulf also was awarded interest since the hearing date on the restitution amount.[28]

The First Tribunal did not decide whether Gulf breached the TUA. It explained that the breach of contract claim was "academic and deserves no further consideration" because First Tribunal already had declared that the TUA's purpose had been frustrated.[29]

### D. Gulf Sues Eni S.p.A. in New York State Court

On September 28, 2018, Gulf sued Eni S.p.A.—Eni's parent company—in New York state court (the "New York Action").[30] The New York Action concerns a dispute over a payment guarantee (the "Guarantee Agreement") between Gulf and Eni S.p.A.[31] Specifically, Gulf contends that Eni S.p.A. owes it "as much as

---

[27] *Id.* ¶¶ 401, 403. The "Angola Project" refers to Eni's purchase of a 13.6% stake in Angola LNG Limited to "increase its gas business in Angola." *Id.* ¶¶ 42, 45, 159. The terms of the deal included "i) a payment of $260 million, and ii) the acquisition by Eni of the residual regasification capacity at [the] Pascagoula Facility." *Id.* ¶ 42. "Decommissioning costs" are the costs associated with returning the LNG terminal at the Facility "to the condition it was prior to entering the contract." *Id.* ¶ 351.

[28] *Id.* ¶ 403.

[29] *Id.* ¶ 347.

[30] Compl. Ex. G.

[31] *Id.* ¶ 1.

approximately $900,000,000 in guaranteed obligations" under the Guarantee Agreement for Reservation and Operating Fees concerning the Pascagoula Facility running from the date of the Final Award until the end of the TUA's initial twenty year term.[32] Gulf advances this claim even though the First Tribunal ruled that the TUA was terminated on the theory that Eni S.p.A "specifically waived, 'to the extent permitted by law, any release, discharge, reduction or limitation of or with respect to any sums owing by [Eni] or any other liability of [Eni] to [Gulf].'"[33]

On December 12, 2018, Eni S.p.A. filed its answer and three counterclaims in the New York Action.[34] Eni S.p.A. asserts, among other things, that "the Guarantee Agreement has terminated due to [Gulf's] numerous and widespread breaches of the TUA and related agreements"—in particular Article 22 of the TUA—and that Gulf's "breaches have also caused [Eni] substantial injury for which Eni S.p.A. seeks damages and other relief."[35]

E.     The Court Enters Judgment on the Final Award

On September 25, 2018, Gulf filed an action in this court to confirm the Final Award in the First Arbitration and enter judgment against Eni requiring it to pay

---

[32] *Id.* ¶¶ 1, 37, 72.

[33] *Id.* ¶ 69 (quoting Guarantee Agreement § 3.2).

[34] Pls.' Suppl. Br. Ex. 1 (Dkt. 33).

[35] *Id.* at 2, 13, 22.

Gulf the amount of the Final Award that remained outstanding.[36] On October 23, 2018, Eni filed its answer and counterclaim.[37] In its counterclaim, Eni asked the court to enter judgment in Eni's "favor confirming the Final Award in its entirety."[38]

In November and December 2018, Gulf and Eni each filed motions for judgment on the pleadings to confirm the Final Award, although they disagreed on certain aspects of the language to be included in a final order and judgment.[39] After filing their respective motions, the parties engaged in negotiations and narrowed their disputes. During a hearing held on February 1, 2019, the court resolved the parties' remaining disagreements over the language of the final order and judgment,[40] which it entered later that day (the "Judgment").[41] The Judgment recites that "both Gulf LNG and ENI USA agree that the Final Award should be confirmed in its entirety" and entered judgment "in favor of Gulf LNG and against ENI USA in the amount of $371,577,849,[42] which Eni subsequently paid in full.[43]

---

[36] C.A. No. 2018-0700-AGB ("Confirmation Action"), Dkt. 1 ¶¶ 1, 48.

[37] Confirmation Action, Dkt. 8.

[38] Confirmation Action, Dkt. 8 at 39.

[39] *See* Confirmation Action, Dkts. 14, 20.

[40] Confirmation Action, Dkt. 47 at 44-49.

[41] Confirmation Action, Dkt. 45.

[42] Confirmation Action, Dkt. 45 ¶ 3.

[43] Answer ¶¶ 4-5.

## F. Eni Initiates the Second Arbitration Against Gulf

On June 3, 2019, Eni filed a second notice of arbitration with the American Arbitration Association, International Centre for Dispute Resolution, asserting three claims against Gulf (the "Second Arbitration")[44]. The first two claims seek declaratory relief and damages based on Gulf's alleged breach of "the TUA by engaging in LNG liquefaction- and export-related activities in direct contravention of the express terms of at least Articles 22.4(a) and 22.4(e) of the TUA."[45] The third claim, for negligent misrepresentation, seeks "declaratory and other relief, in the form of damages and/or restitution . . . as a result of Gulf's wrongful conduct" before the First Tribunal.[46] These claims are discussed in greater detail below.

## G. Procedural History

On June 17, 2019, Gulf filed this action under the Federal Arbitration Act ("FAA") and 10 *Del. C.* §§ 5702 and 5703(b), seeking two forms or relief: (i) "a permanent injunction staying the Second Arbitration" (Count I) and (ii) "a declaratory judgment that Eni . . . is barred from maintaining or pursuing the Second Arbitration" (Count II).[47] On July 9, 2019, Gulf filed a motion for judgment on the

---

[44] Compl. Ex. F ("Second Arbitration Notice").

[45] *Id.* ¶¶ 66-67, 69-70.

[46] *Id.* ¶ 76.

[47] Compl. ¶¶ 12, 58, 61. Section 5702 of the Delaware Uniform Arbitration Act provides, in relevant part, that "any application to the Court of Chancery to enjoin or stay an arbitration, obtain an order requiring arbitration, or to vacate or enforce an arbitrator's

10

pleadings on Count I to enjoin Eni "from taking any further steps or actions in the Second Arbitration other than to request that the Second Arbitration be discontinued and dismissed at Eni's cost."[48]  Briefing and argument on this motion, including supplemental submissions, was completed on September 11, 2019.

## II.    ANALYSIS

Under Court of Chancery Rule 12(c), the court may grant a motion for judgment on the pleadings "when no material issue of fact exists and the movant is entitled to judgment as a matter of law."[49]  To obtain a permanent injunction, the Gulf entities must (i) "succeed on the merits of their case," (ii) "demonstrate that irreparable harm will result in the absence of an injunction," and (iii) "prove that, on balance, the equities weigh in favor of issuing the injunction."[50]

The parties' positions on the merits of Gulf's request for a permanent injunction have shifted since Gulf filed this case.  Ultimately, the parties each came to rely primarily on one of two different lines of authority concerning the arbitration

---

award shall be decided by the Court of Chancery in conformity with the Federal Arbitration Act" unless the parties' arbitration agreement specifically refers to, and expresses their intention to apply, the Delaware Uniform Arbitration Act.  10 *Del. C.* § 5702(c).  The arbitration provision in the TUA contains no such reference and reflects no such intention. *See* TUA Art. 20.

[48] Pls.' Mot. ¶ 34 (Dkt. 14).

[49] *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d 1199, 1205 (Del. 1993).

[50] *Harden v. Christina Sch. Dist.*, 924 A.2d 247, 269 (Del. Ch. 2007).

11

of disputes under the FAA: (i) cases enforcing the policy against collateral attacks on arbitration awards and (ii) cases interpreting broad arbitration clauses as written on the question of "arbitrability," *i.e.*, "who decides" whether a particular issue is arbitrable. The court begins by reviewing the parties' contentions concerning these lines of authority.

### A. The Collateral Attack Doctrine

Gulf argues that the court should enjoin the Second Arbitration because it is an impermissible collateral attack on the Judgment this court entered confirming the Final Award in the First Arbitration. In support of this argument, Gulf relies on a series of decisions where courts have (i) dismissed litigation claims[51] or (ii) entered injunctions against the procession of a second arbitration,[52] which amounted to a collateral attack on an award entered in a prior arbitration. The rationale of these decisions is that the FAA affords limited review of and a tight deadline to challenge an arbitration award to ensure that finality is achieved promptly and efficiently.

---

[51] *See e.g., Phillips Petroleum Co. v. Arco Alaska, Inc.*, 1988 WL 60380, at *6 (Del. Ch. June 14, 1988) (damages claim that adversary "acted illegally in the arbitration, thereby tainting the arbitration award" an impermissible collateral attack); *Pryor v. IAC/InterActive Corp.*, 2012 WL 2046827, at *6 (Del. Ch. June 7, 2012) (breach of contract claim premised on adversary providing disallowed evidence in a prior arbitration an impermissible collateral attack); *Gulf Petro Trading Co., Inc. v. Nigerian Nat'l. Petroleum Corp.*, 512 F.3d 742, 749-50 (5th Cir. 2008) (common law and statutory claims premised on an arbitration panel's misconduct in a previous arbitration an impermissible collateral attack).

[52] *Prudential Sec. Inc. v. Hornsby*, 865 F.Supp. 447, 450-51 (N.D. Ill. 1994); *Decker v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 205 F.3d 906, 910 (6th Cir. 2000); *Arrowood Indem. Co. v. Equitas Ins. Ltd.*, 2015 WL 4597543, at *4-5 (S.D.N.Y. July 30, 2015).

Under Section 10 of the FAA, a party may petition to vacate an arbitration award only in limited circumstances, *i.e.*, where (i) "the award was procured by corruption, fraud, or undue means," (ii) "there was evident partiality or corruption in the arbitrators," (iii) "the arbitrators were guilty of . . . misbehavior by which the rights of any party have been prejudiced," or (iv) "the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made."[53] Under Section 11, a party similarly may petition to modify an arbitration award only in limited circumstances, *i.e.,* where (i) "there was an evident material miscalculation of figures or an evident material mistake," (ii) "the arbitrators have awarded upon a matter not submitted to them," or (iii) "the award is imperfect in matter of form not affecting the merits of the controversy."[54] Section 12 of the FAA requires that "a motion to vacate, modify, or correct an award must be served . . . within three months after the award is filed or delivered."[55]

The court reviews next three decisions where courts have granted the relief Gulf seeks here—entry of an injunction against the procession of a second arbitration

---

[53] 9 U.S.C. § 10(a).

[54] 9 U.S.C. § 11(a)-(c).

[55] 9 U.S.C. § 12.

under the collateral attack doctrine—in deference to the policies underlying the foregoing provisions of the FAA.

In *Prudential Securities Incorporated v. Hornsby*, the district court enjoined Arthur Hornsby from pursuing a second arbitration against Prudential.[56] In the first arbitration, the tribunal awarded Hornsby $290,000 in resolving his claims that a Prudential employee (Storaska) mismanaged his account and that Prudential failed to supervise Storaska adequately and fraudulently concealed his wrongdoing.[57] Ten months later, Hornsby filed a second arbitration, alleging a conspiracy between Prudential and Storaska to "feign[] compliance with [Hornsby's] document requests during the AAA arbitration while fraudulently concealing internal memoranda that confirmed Storaska's improper sales practices and Prudential's toleration of those practices."[58] Hornsby sought "compensatory and punitive damages in excess of $1 million against Prudential" in the second arbitration.[59]

The district court found that the second arbitration amounted to a collateral attack on the prior AAA arbitration because the claim in the second arbitration "is premised entirely on Prudential's fraudulent concealment of documents from the

---

[56] 865 F.Supp. at 452-53.

[57] *Id.* at 448.

[58] *Id.* at 448-49.

[59] *Id.* at 449.

original arbitration panel, misconduct in the proceeding itself."[60] The district court's reasoning drew on the policies underlying the provisions of the FAA governing review of arbitration awards:

> The strictures of section 10 and section 12 [of the FAA] are designed to afford an arbitration award finality in a timely fashion, promoting arbitration as an expedient method of resolving disputes without resort to the courts.
>
> * * * * *
>
> Because the policies behind section 10 would be eviscerated if it were only an optional way to modify an arbitration award, an attempt to modify an award by a route or mechanism other than section 10 must be enjoined. Like the collateral actions noted above, Hornsby's attempt to arbitrate an "independent" fraud claim against Prudential is, in reality, an attempt to augment and modify the first arbitration award.[61]

In *Decker v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, the Sixth Circuit Court of Appeals affirmed a district court's entry of an injunction to enjoin a second arbitration.[62] In the first arbitration, an NASD arbitration panel awarded Emily Decker $40,000 in damages in resolving her claim that Merrill Lynch had mismanaged Decker's securities investment.[63] A few months later, Decker filed a complaint against Merrill Lynch in Michigan state court, which it removed to federal court, alleging that Merrill Lynch interfered with the arbitration when one of its

---

[60] *Id.* at 451, 453.

[61] *Id.* at 450, 451.

[62] 205 F.3d at 911-12.

[63] *Id.* at 908.

15

subsidiaries hired the chairperson of the arbitration panel.[64] Decker then filed a second arbitration with the NASD, asserting the same claims.[65]

The Sixth Circuit agreed with the district court that Decker's complaint and second arbitration amounted to a collateral attack, because Decker's "ultimate objective in this damages suit is to rectify the alleged harm she suffered by receiving a smaller arbitration award than she would have received in the absence of the chairperson's relationship with Merrill Lynch."[66] Invoking the policy considerations underlying the FAA, the Sixth Circuit affirmed the district court's dismissal of the complaint and enjoining of the second arbitration:

> The FAA provides the exclusive remedy for challenging acts that taint an arbitration award whether a party attempts to attack the award through judicial proceedings or through a separate second arbitration. It would be a violation of the FAA to allow Decker to arbitrate the very same claims that we have determined constitute an impermissible collateral attack when previously presented for adjudication by a court. Decker may not bypass the exclusive and comprehensive nature of the FAA by attempting to arbitrate her claims in a separate second arbitration proceeding.[67]

In *Arrowood Indemnity Company v. Equitas Insurance Limited*, the district court enjoined certain "Underwriters" from pursuing a second arbitration against

---

[64] *Id.*

[65] *Id.*

[66] *Id.* at 910.

[67] *Id.* at 911.

16

Arrowood.[68]  In the first arbitration, an arbitration panel accepted Arrowood's interpretation of certain language in a contractual reinsurance program—*i.e.*, a "Common Cause Coverage" provision that included a "First Advised Clause"—and issued an award requiring the Underwriters to pay Arrowood approximately $44.8 million.[69]  Over a year later, the Underwriters filed a second arbitration demand (i) seeking access to certain Arrowood records concerning the interpretation of the Common Cause Coverage provision and (ii) asserting that Arrowood "engaged in intentional misconduct in the recent arbitration between the parties."[70]

The district court found that the second arbitration was "in direct contravention of the FAA" and "must be enjoined" because it sought "to recover all sums paid to Arrowood" in the first arbitration.[71]  The district court further explained that the Underwriters' theory was that the first arbitration panel "erred in its interpretation of the Common Cause Provision due to Arrowood wrongfully, and 'improperly,' withholding relevant documents" during the first arbitration.[72]

---

[68] 2015 WL 4597543, at *8.

[69] *Id.* at *1-2.

[70] *Id.* at *3-4.

[71] *Id.* at *6.

[72] *Id.*

17

## B. Enforcement of Broad Arbitration Clauses

In response to Gulf's reliance on the collateral attack doctrine, Eni contends that the court "lacks jurisdiction to entertain the matters set forth in the complaint because the TUA delegates the threshold question of 'arbitrability' to the arbitration tribunal."[73]  In other words, the policy underlying Eni's opposition is that the court must enforce a broad arbitration clause that delegates to an arbitrator the authority to decide a disagreement about the scope of an arbitration provision.[74]

The United States Supreme Court held long ago that the "question whether the parties have submitted a particular dispute to arbitration, *i.e.*, the '*question of arbitrability*,' is 'an issue for judicial determination [u]nless the parties clearly and unmistakably provide otherwise.'"[75]  The test under Delaware law for determining when there is clear and unmistakable evidence that the parties intended to have an arbitrator rather than the court decide questions of substantive arbitrability turns on whether the arbitration clause: (1) "generally provides for arbitration of all disputes;"

---

[73] Def.'s Opp'n Br. 3 (Dkt. 17).

[74] *UPM-Kymmene Corp. v. Renmatix, Inc.*, 2017 WL 4461130, at *4 (Del. Ch. Oct. 6, 2017) ("A disagreement about the scope of an arbitration provision—such as whether an arbitration provision governs a particular dispute—is known as an issue of 'substantive arbitrability.'") (citations omitted).

[75] *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002) (quoting *AT&T Techs., Inc. v. Commc'ns Workers*, 475 U.S. 643, 649 (1986)).

and (2) "incorporates a set of arbitration rules that empower[s] arbitrators to decide arbitrability."[76] New York law, which governs the TUA,[77] is to the same effect.[78]

In my opinion, the parties to the TUA evinced a "clear and unmistakable" agreement to arbitrate the issue of arbitrability. To start, the TUA expressly provides, with a limited exception not relevant here, that "all possible disputes" shall be resolved through arbitration:

> Any Dispute . . . shall be exclusively and definitively resolved through final and binding arbitration, it being the intention of the Parties that this is a broad form arbitration agreement designed to encompass all possible disputes.[79]

The TUA goes on to define the term "Dispute" broadly to include "any dispute, controversy or claim . . . arising out of, relating to, or connected with this Agreement . . . as well as any dispute over *arbitrability* or jurisdiction,"[80] and expressly provides

---

[76] *James & Jackson, LLC v. Willie Gary, LLC*, 906 A.2d 76, 80 (Del. 2006).

[77] TUA Art. 19.

[78] *See Smith Barney Shearson Inc. v. Sacharow*, 689 N.E.2d 884, 885, 888 (N.Y. 1997) (finding "clear and unmistakable" evidence of an agreement to arbitrate arbitrability where the arbitration clause provided that "[a]ny controversy . . . shall be settled by arbitration in accordance with the rules of the NASD Code" and the NASD Code provided that "[t]he arbitrators shall be empowered to interpret and determine the applicability of all provisions under this Code") (internal quotations omitted).

[79] TUA Art. 20.1(a).

[80] *Id.* Art. 1.57 (emphasis added).

that "arbitration shall be conducted in accordance with the International Arbitration Rules of the American Arbitration Association."[81]

Focusing on the broad language in the TUA's arbitration clause, Eni argues that Gulf's request for an injunction must be denied because the arbitrators in the Second Arbitration—and not this court—must decide the whether the Final Award entered in the First Arbitration has any preclusive effect on the claims asserted in the Second Arbitration. In making this argument, Eni emphasizes that the United States Supreme Court unanimously held earlier this year in *Henry Schein, Inc. v. Archer and While Sales, Inc.*, that courts must respect the parties' decision to delegate the arbitrability question to an arbitrator even if the argument for arbitration appears to be frivolous:

> We must interpret the [FAA] as written, and the [FAA] in turn requires that we interpret the contract as written. When the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract. In those circumstances, a court possesses no power to decide the arbitrability issue. That is true even if the court thinks that the argument that the arbitration agreement applies to a particular dispute is wholly groundless.[82]

*Schein* is a consequential decision that emphatically reinforces that arbitration rights are a creature of contract, and thus that courts must enforce such contracts as

---

[81] *Id.* Art. 20.1(b).

[82] 139 S.Ct. 524, 529 (2019).

written.[83] But *Schein* does not address the collateral attack doctrine. Nor does *Schein* address the scenario present here where a second, related arbitration proceeding has been filed. The court discusses next two circuit court decisions on which Eni relies where the courts have enforced broad arbitration clauses and allowed an arbitrator to determine the arbitrability of the claims asserted in a second arbitration.

In *John Hancock Mutual Life Insurance Company v. Olick*, the Third Circuit considered "the question of whether, under the [FAA], a district court has the authority, notwithstanding a valid arbitration clause, to enjoin a party from pursuing arbitration on res judicata grounds arising from both a prior arbitration and a prior judgment."[84] The prior judgment arose from a district court action captioned *Carroll v. Hancock* that involved alleged "violations of several federal and state statutes, along with various common law fraud theories, in connection with a series of limited partnership transactions."[85] The prior arbitration related to the same limited partnership transactions "that were the subject of the *Carroll* action."[86]

---

[83] One consequence of *Schein* is that it should end the additional "no non-frivolous argument about substantive arbitrability" inquiry this court has conducted under *McLaughlin v. McCann*, 942 A.2d 616, 626-27 (Del. Ch. 2008) "to guard against the frivolous invocation of an arbitration clause even when the *Willie Gary* test has been satisfied." *UPM-Kymmene*, 2017 WL 4461130, at *4.

[84] 151 F.3d 132, 133 (3d Cir. 1998).

[85] *Id.* at 134.

[86] *Id.*

Over one year after entry of the prior judgment and of an award in the prior arbitration, Olick filed a second arbitration asserting claims "sounding in fraud, misrepresentation, tortious interference with business relations, slander, libel, and RICO violations."[87]  Hancock argued that Olick's second arbitration claim "arose from the same factual circumstances as the previous arbitration . . . as well as the prior federal judgment, and therefore principles of res judicata barred Olick from raising a claim that could have been raised at either the prior arbitration proceeding or the *Carroll* litigation."[88]

Recognizing that the case presented "somewhat of a 'hybrid' situation in that Hancock's objection to arbitrating Olick's claims stems from both a prior arbitration and a prior judgment," the Third Circuit differentiated between the two scenarios in its analysis.[89]  With respect to the prior federal judgment, the Third Circuit concluded, based on its precedents, "that the district court . . . should have first decided the preclusive effect of the prior federal judgment as it relates to Olick's [second] demand for arbitration."[90]  With respect to the prior arbitration, however, the Third Circuit concluded that "Hancock's res judicata objection based on the prior

---

[87] *Id.*

[88] *Id.*

[89] *Id.* at 137.

[90] *Id.* at 138-39.

22

arbitration is an issue to be arbitrated and is not to be decided by the courts."[91]  In

reaching the latter conclusion, Circuit Judge Seitz, writing for the panel, explained

the Court's rationale as follows:

> The reasoning underlying this approach is that a provision regarding
> the finality of arbitration awards is a creature of contract and, like any
> other contractual provision that is the subject of dispute, it is within the
> province of arbitration unless it may be said "with positive assurance"
> that the parties sought to have the matter decided by a court.[92]

In *Citigroup, Inc. v. Abu Dhabi Investment Authority*, the Second Circuit held

that the arbitrators in a second arbitration "should also decide the claim-preclusive

effect of a federal judgment confirming an arbitral award."[93]  In the first arbitration,

the Abu Dhabi Investment Authority (ADIA) asserted a variety of claims (fraud,

securities fraud, negligent misrepresentation, breach of fiduciary duty, breach of

contract, and breach of the implied covenant of good faith and fair dealing) against

Citigroup, alleging that it "had diluted the value of [ADIA's] investment [in

Citigroup] by issuing preferred shares to other investors."[94]  The first arbitration

panel returned an award in favor of Citigroup, which the United States District Court

for the Southern District of New York later confirmed.  While that confirmation

proceeding was pending, ADIA filed a second arbitration "again asserting claims of

---

[91] *Id.* at 140.

[92] *Id.* at 139.

[93] 776 F.3d 126, 131 (2d Cir. 2015).

[94] *Id.* at 127.

breach of contract and breach of the implied covenant of good faith and fair dealing."[95]  Citigroup sought to enjoin the second arbitration "on the ground that ADIA's new claims were barred by the doctrine of claim preclusion, or *res judicata*, because they were or could have been raised in the first arbitration."[96]

The Second Circuit's explained that its conclusion that the arbitrators should decide the claim-preclusive effect of the judgment confirming the first arbitral award was as a "simple intuitive step" that followed from two of the Second Circuit's prior precedents.[97]  In those prior cases, the Second Circuit held "that arbitrators are to resolve the claim-preclusive effect of an arbitration award confirmed by a state court and the issue-preclusive effect of a federal judgment."[98]  Additionally, the Second Circuit expressed the view that the arbitrators would be better positioned than the confirming court to consider the preclusive effect of an arbitration award based on their familiarity with the underlying merits:

> Indeed, in confirming the award, the district court did not review the merits of any of ADIA's substantive claims or the context in which those claims arose.  Instead, it considered only whether the arbitration panel's evidentiary rulings and application of New York choice-of-law principles violated the FAA.  Under these circumstances, a district court

---

[95] *Id.*

[96] *Id.* at 128.

[97] *Id.* at 131.

[98] *Id.*  S*ee also Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Belco Petroleum Corp.*, 88 F.3d 129 (2d Cir. 1996) (addressing preclusive effect of arbitration award confirmed by a state court); *United States Fire Ins. Co. v. Nat'l Gypsum*, 101 F.3d 813 (2d Cir. 1996) (addressing preclusive effect of federal judgment).

unfamiliar with the underlying circumstances, transactions, and claims, is not the best interpreter of what was decided in the arbitration proceedings, the result of which it merely confirmed.[99]

* * * * *

With the foregoing discussion of the legal principles upon which the parties primarily rely in mind, the court turns next to consider the elements of Gulf's request for entry of a permanent injunction to enjoin Eni from pursuing the claims it has asserted in the Second Arbitration.

## C. The Merits of Gulf's Request for a Permanent Injunction

Gulf contends that the two substantive claims Eni has asserted in the Second Arbitration—for negligent misrepresentation and breach of contract—constitute impermissible collateral attacks on the First Arbitration.[100] Synthesizing the six cases applying the collateral attack doctrine cited above, Gulf contends the relevant inquiry for determining if the claims in the Second Arbitration amount to an impermissible collateral attack is whether "the nature of the claims and relief sought in the Second Arbitration . . . (a) seek[] to rectify alleged harm suffered in the earlier arbitration, or (b) challeng[e] alleged misconduct occurring in that earlier proceeding which purportedly tainted the prior Award."[101]

---

[99] 776 F.3d at 132-33 (citations omitted).

[100] Gulf also asserted a claim for declaratory relief in the Second Arbitration, but that claim goes hand in hand with its contract claim. *See* Second Arbitration Notice ¶¶ 66-67, 69-70.

[101] Pls.' Suppl. Br. 2.

25

In response, Eni advances essentially three lines of argument. First, it contends that *Schein* overruled all of the cases on which Gulf relies that have applied the collateral attack doctrine, each of which pre-dates *Schein*.[102] Second, Eni discounts most of Gulf's precedents because, according to Eni, they "do not address the arbitrability question."[103] Third, Eni argues as a factual matter that its claims in the Second Arbitration do not constitute a collateral attack on the Final Award.[104] The court addresses these issues, in turn, below.

As to Eni's first line of argument, *Schein* nowhere mentions the collateral attack doctrine. *Schein* does not even refer to any of the cases Gulf cites that have applied that doctrine. In the absence of any actual discussion or analysis of the collateral attack doctrine in *Schein*, this court declines to assume that the Supreme Court's rejection of a "wholly groundless" exception to arbitrability means that it intended to overrule this well-established doctrine. Apart from the fact that *Schein* does not even discuss the issue, the question of arbitrability that *Schein* does address focuses on the need to honor contractual intent whereas the collateral attack doctrine is premised on different considerations, namely the policies of finality and limited

---

[102] Def.'s Suppl. Br. 4 (Dkt. 34).

[103] *Id.* 6.

[104] *Id.* 14.

review underlying the provisions of the FAA governing judicial review and confirmation of arbitration awards.[105]

As to Eni's second line of argument, it is not surprising that a decision applying the collateral attack doctrine would not separately consider the question of arbitrability. The point of the doctrine is that a court may intervene to dismiss litigation claims or to enjoin a second round of arbitration based on a prior arbitration in order to vindicate the policies of finality and limited review of arbitration awards embedded in the FAA *notwithstanding the existence of a broad arbitration clause*. As the *Arrowood* court put it:

> Although parties are generally free to seek arbitration under a broad arbitration clause, courts may intervene if the "ultimate objective . . . is to rectify the alleged harm" a party suffered from an unfavorable arbitration award "by attempting to arbitrate [its] claims in a separate second arbitration proceeding." Such arbitral mulligans are forbidden by the FAA, which is the "exclusive remedy for challenging acts that taint an arbitration award[,] whether a party attempts to attack the award through judicial proceedings or through a second arbitration."[106]

This approach is consistent with then-Chancellor Strine's decision in *Pryor v. IAC/InterActiveCorp.*,[107] a case on which both parties rely. In that case, William Pryor sued IAC in the Court of Chancery for alleged misconduct in an arbitration

---

[105] *See* Part II.A.

[106] 2015 WL 4597543, at *5 (quoting *Decker*, 205 F.3d at 910-11).

[107] 2012 WL 2046827.

27

that valued Pryor's shares in Shoebuy.com, Inc., a company that IAC acquired.[108] The arbitrator selected Houlihan Lokey as the valuation expert for the arbitration, and Houlihan Lokey issued an award adopting IAC's proposed appraisal value.[109] After issuance of the arbitration award, Pryor filed suit in the Court of Chancery seeking to vacate the award and asserting claims for breach of contract and breach of fiduciary duty against IAC for introducing in the arbitration "certain market evidence in violation of the terms of the Stockholder's Agreement" that governed the valuation of his shares.[110]

In adjudicating IAC's motion to dismiss, the court found (i) that "the substantive arbitrability of the fiduciary duty and contract claims [must] be determined by the arbitrator" and (ii) relying on *Decker*, that the "breach of contract claim fails for a separate reason because . . . it constitutes an impermissible collateral attack" on the arbitration award.[111] Significantly, the court dismissed the fiduciary duty claim "without prejudice to allow Pryor to re-file in the event that the arbitrator

---

[108] *Id.* at *1.

[109] *Id.*

[110] *Id.*

[111] *Id.* at *6. In finding that the contract claim constituted an impermissible collateral attack, the court reasoned as follows: "Pryor's objective in this breach of contact claim is to remedy 'the alleged harm [he] suffered by receiving a smaller arbitration award than [he] would have received in the absence of the [submission of allegedly improper evidence].' In order to obtain such relief, a plaintiff is limited to proceeding under the FAA." *Id.*

28

concludes that the breach of fiduciary duty claim is not arbitrable," but dismissed the contract claim "with prejudice because the flaw that this Count is an impermissible collateral attack on the [arbitration award] is not curable by proceeding before the arbitrator at this belated stage."[112] The court's "with prejudice" dismissal of the contract claim accords with the ability of courts to intervene to dispose of collateral attack claims definitively notwithstanding the existence of a broad arbitration clause.

Eni's third line of argument gets to the core issue before the court, *i.e.*, whether the negligent misrepresentation and contract claims it has asserted in the Second Arbitration amount to a collateral attack on the Final Award. In my opinion, for the reasons discussed next, the negligent misrepresentation claim does but the contract claim does not.

### 1. Negligent Misrepresentation Claim

Eni's claim for negligent misrepresentation, seeks "declaratory and other relief, in the form of damages and/or restitution . . . as a result of Gulf's wrongful conduct" before the First Tribunal.[113] The gravamen of this claim is that Gulf falsely represented to the First Tribunal "that it would no longer be able to recover Reservation and Operating fees from its other customer, ALSS or from any other

---

[112] *Id.* at *7.

[113] Second Arbitration Notice ¶ 76.

source, if Eni prevailed in the arbitration" in order "[t]o secure the award of equitable compensation for Decommissioning Costs of the Pascagoula Facility in the amount of approximately $418 million."[114]   According to Eni, had Gulf not made this misrepresentation, "the compensation amount paid by Eni for decommissioning costs would have been greatly reduced, or reduced to zero" because the First Tribunal "excluded the amount of future Reservation and Operating Fee payments that Gulf would receive from ALSS in calculating the compensation for Decommissioning Costs [it] awarded to Gulf."[115]

The negligent misrepresentation claim is a collateral attack on the Final Award for two reasons.  First, Eni's ultimate objective in the Second Arbitration is to receive payment for decommissioning costs it was required to pay to satisfy the Final Award.  In other words, Eni is seeking to claw back some or all of the damages that were awarded to Gulf in an arbitration proceeding that is supposed to be concluded.  If Eni had its way, for all practical purposes, the finality of the Final Award would be undone and the monetary recovery Gulf obtained in the First Arbitration would be nullified.  This is the epitome of a collateral attack.[116]

---

[114] *Id.* ¶ 72.

[115] *Id.* ¶ 75.

[116] *See Arrowood*, 2015 WL 4597543, at *6 (second arbitration that sought "to recover all sums paid to Arrowood" in the first arbitration was a collateral attack). *See also Prudential*, 865 F.Supp. at 451 (second arbitration that attempted "to augment and modify the first arbitration award" was a collateral attack); *Decker*, 205 F.3d at 910 (second arbitration

30

Second, and related to the first point, the essence of Eni's negligent misrepresentation claim is that Gulf procured damages in the First Arbitration by engaging in misconduct that tainted the Final Award. Yet Eni made no effort to seek to vacate the Final Award on this ground and has no right to bring a collateral attack now to "challenge the very wrongs affecting the award for which review is provided under section 10 of the Arbitration Act."[117]

Eni devotes substantial attention in its opposition papers explaining why its contract claim does not constitute a collateral attack, a conclusion with which the court agrees, but it makes virtually no effort to do so with respect to its negligent misrepresentation claim.[118] Indeed, Eni's defense on this point boils down to the conclusory assertion that "Eni does not assert [the negligent misrepresentation] claim in order to undo or alter the prior Award."[119] This contention exalts form over substance. Eni did pay Gulf the sum it was ordered to pay in the Judgment and, as

---

brought to "rectify . . . receiving a smaller arbitration award" than desired in first arbitration was a collateral attack).

[117] *Corey v. New York Stock Exch.*, 691 F.2d 1205, 1213 (6th Cir. 1982) ("Very simply, Corey did not avail himself of the review provisions of section 10 of the Arbitration Act and may not transform what would ordinarily constitute an impermissible collateral attack into a proper independent direct action by changing defendants and altering the relief sought."); *see also Phillips Petroleum*, 1988 WL 60380, at *6 (damages claim premised upon one party "act[ing] illegally in the arbitration, thereby tainting the arbitration award" an impermissible collateral attack).

[118] *See* Def.'s Suppl. Br. 14-22.

[119] *Id*. 20.

technical matter, it does not seek to alter the words of the Judgment. As a substantive matter, however, Eni's misrepresentation claim is a transparent tactic to claw back the damages it paid Gulf under the Judgment for the purpose of reducing and potentially nullifying the substance of the damages award that Gulf obtained as a result of the First Arbitration.

## 2. Contract Claim

In the Second Arbitration, Eni seeks declaratory relief and damages and/or restitution on the theory that "Gulf breached the TUA by engaging in liquefaction- and export-related activities in direct contravention of the express terms of at least Articles 22.4(a) and 22.4(e) of the TUA."[120] In the First Arbitration, Eni sought a declaration that Gulf "breached the warranties and covenants set forth in at least Articles 22.4(a) and 22.4(e) and that Eni [] thereby may properly terminate the TUA pursuant to Article 18.1."[121] Importantly, the First Tribunal never ruled on these issues, which it found to be academic in view of its ruling that the TUA had been terminated for frustration of purpose:

> Considering the Tribunal's finding on the frustration of TUA's purpose, the question as to whether [the Gulf entities] have breached the warranties and covenants, including those set forth at Articles 22.4(a) and 22(e) of the TUA, has become academic and deserves no further consideration.[122]

---

[120] Second Arbitration Notice ¶ 66-67, 69-70.

[121] Dkt. 38 ¶ 64.

[122] Final Award ¶ 347.

The contract claim in the Second Arbitration does not constitute a collateral attack on the Final Award under Gulf's own formulation of the operative test. Specifically, given that the First Tribunal never reached the merits of the claim for breaches of Articles 22.4(a) and 22.4(e) of the TUA and never granted any relief based on that claim, it cannot be said that Eni's contract claim in the Second Arbitration seeks to rectify "harm" allegedly suffered in the First Arbitration. Nor can it be said—and Gulf does not contend otherwise—that Eni is challenging alleged misconduct in the First Arbitration relating to the contract claim as having somehow tainted the Final Award.

Given the court's conclusion that the contract claim in the Second Arbitration is not a collateral attack, and the broad language of the arbitration provision in the TUA that evinces the parties' agreement to arbitrate the issue of arbitrability, it is up to the tribunal in the Second Arbitration to determine whether the contract claim is arbitrable and, if so, whether that claim would be precluded based on the First Arbitration. This conclusion accords with the decisions in *Schein*, *Olick*, and *Citigroup* discussed above.[123]

\* \* \* \* \*

---

[123] *See* Part. II.B.

For the reasons explained above, the court concludes that Gulf has established that Eni's misrepresentation claim in the Second Arbitration constitutes an impermissible collateral attack on the Final Award but that Gulf has failed to make this showing with respect to its contract claim in the Second Arbitration.

### D. The Remaining Elements for a Permanent Injunction

It is well-established under Delaware law that requiring a party to "devote unnecessary time and resources to contest" an issue that the court has determined to be "not arbitrable" amounts to irreparable harm.[124] Accordingly, absent an injunction, Gulf would suffer irreparable harm if it were required to arbitrate the misrepresentation claim in the Second Arbitration.

Finally, the balance of the equities weighs in Gulf's favor to obtain a permanent injunction with respect to the negligent misrepresentation claim. Without an injunction, Gulf will be deprived of the finality to which it is entitled concerning the damages award it obtained as a result of the First Arbitration. On the other side of the ledger, Eni has made no argument that the equities weigh in its favor, and the court is hard-pressed to conceive of a basis for such an argument insofar as the negligent misrepresentation claim is concerned.

---

[124] *Bd. of Educ. of Sussex Cty. Vocational-Tech. Sch. Dist. v. Sussex Tech. Educ. Ass'n*, 1998 WL 157373, at \*5 (Del. Ch. Mar. 18, 1998); *see also Delaware Pub. Emps. v. New Castle Cty.*, 1994 WL 515291, at \*4 (Del. Ch. Aug. 25, 1994).

## III.   CONCLUSION

For the foregoing reasons, Gulf's motion for judgment on the pleadings is granted with respect to the negligent misrepresentation claim that Eni has asserted in the Second Arbitration but otherwise is denied. The parties are directed to confer and to submit an implementing order consistent with this decision within five business days.